KATHY A.F. DAVIS (4022)
ROGER R. FAIRBANKS (3792)
K. TESS DAVIS (15831)
Assistant Attorneys General
Utah Attorney General's Office
MARK BOSHELL (16002)
KENDALL G. LAWS (14700)
Special Assistant Attorneys General
SEAN D. REYES (7969)
UTAH ATTORNEY GENERAL
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
kathydavis@agutah.gov
rfairbanks@agutah.gov
jgarfield@agutah.gov
mboshell@utah.gov
klaws@utah.gov

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH, including the UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION (SITLA), an agency of the State of Utah; and EMERY COUNTY, a Utah political subdivision, | Case No. 2:24-cv-00172 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| DEB HAALAND, in her official capacity as SECRETARY OF THE INTERIOR; the DEPARTMENT OF THE INTERIOR, an agency of the United States of America; TRACY STONE-MANNING, in her official capacity as DIRECTOR OF THE BUREAU OF LAND MANAGEMENT; and the BUREAU OF LAND MANAGEMENT, an agency of the United States of America, | Judge Ted Stewart<br>Magistrate Judge Daphne A. Oberg |
| Defendants, | |

Plaintiffs, State of Utah, including the Utah School and Institutional Trust Lands Administration (SITLA) and  Emery County by and through counsel, file this Complaint for Declaratory and Injunctive Relief against Defendants, Deb Haaland, in her official capacity as Secretary of the U.S. Department of the Interior (DOI), the DOI, Tracy Stone-Manning, in her official capacity as the Director of the U.S. Bureau of Land Management (BLM), and the BLM, and allege as follows:

## INTRODUCTION AND BACKGROUND

1.      Plaintiffs bring this action for declaratory and injunctive relief to challenge and have this Court declare invalid and set aside the BLM's October 28, 2022, Decision Record on the San Rafael Desert Travel Management Plan: Reconsideration of Routes as Required by the 2022 Settlement Agreement (DOI-BLM-UT-G020-2018-0004-EA) (DR).  The San Rafael Desert Travel Management Area ("TMA") encompasses roughly 377,609 acres of lands managed by the Bureau of Land Management ("BLM") in southeastern Emery County, Utah.

2.      This DR – a "Reconsideration of Routes," as the BLM characterized it – resulted in the closure of approximately 195 miles of roads and road segments that were previously designated as open in the original San Rafael Desert Travel Management Plan (Original TMP), which was adopted two years earlier by the BLM on August 21, 2020. The BLM Map which depicts in red the routes and route segments closed by the October 28, 2022 Decision Record can be accessed at: https://eplanning.blm.gov/EPLCommentMap/?itemId=2d960e575aa3498d8c16f482f4a93c68

3.      On that August 21, 2020, the BLM issued its DR and Finding of No Significant Impact (FONSI) for the Original TMP, DOI-BLM-UT-G020-2018-0004-EA.  Plaintiffs did not challenge the Original TMP and contend that it should remain in effect without the modifications of the DR.

4.      On September 21, 2020, the Southern Utah Wilderness Alliance, and The Wilderness Society (collectively SUWA) appealed the DR to the Interior Board of Land Appeals (IBLA).  IBLA 2020- 414.  SUWA also challenged the FONSI, related Environmental Assessment (EA), and Original TMP.

5.      SUWA sought to force the BLM to reconsider and close additional routes that are within an area that it desires to be "Red Rock Wilderness."

6.      Every year for the past twenty-five years, SUWA and a few members of Congress sponsor a bill called the Red Rock Wilderness Bill, aimed at creating millions of additional acres of congressionally designated wilderness throughout Utah. The bill has never succeeded. The approximately 195 miles of routes and route segments that were closed by BLM's DR are within the area SUWA has unsuccessfully sought to have Congress designate as Red Rock Wilderness.

7.      The IBLA granted the State of Utah's Motion to Intervene in IBLA 2020-414 in support of the BLM's DR, FONSI and EA.

8.      After the IBLA denied SUWA's Petition for Stay, SUWA voluntarily dismissed its appeal in IBLA 2020-414 and thereafter on February 16, 2021, renewed its challenge of the Original TMP by filing a complaint for declaratory and injunctive relief in the Federal District Court for the District of Utah. *SUWA et. al. v. BLM*, 2:21-cv-00091- DAK (D. Utah 2021).

9.      The court granted the State's and County's Motion to Intervene on June 21, 2021. *Id*. Dkt 29.

10.      SUWA and the BLM negotiated a settlement ("Settlement Agreement") of the case in Utah Federal District Court without any inclusion or involvement of the State and other intervenors and the court dismissed the case. *Id*., Dkt 60.

11.      Pursuant to the Settlement Agreement, BLM reconsidered for closure approximately 195 miles of roads in the Original TMP that were previously designated as open. *Id*. Dkt 52.

12.     BLM held a meeting with the State, SITLA and Emery County, all Cooperating Agencies, on July 7, 2022, to unveil its Preliminary Reconsideration Decision. At that meeting maps were shown but not disseminated and it was apparent that BLM was not interested in hearing concerns or comments from the State, SITLA, or Emery County prior to the public comment period on the Preliminary Reconsideration Decision.

13.     BLM planned to publish the Preliminary Reconsideration Decision and open public comment the next day, however, due to technical difficulties, publication did not occur until July 12, 2022.

14.     The State of Utah and Emery County submitted their comment letters on August 26, 2022.

15.     On October 28, 2022, BLM published its DR that not only fully incorporated the entirety of the Preliminary Reconsideration Decision but closed an additional three roads (SD308, SD312, and SD333) that the State, Emery County and SITLA were told would be left open.

16.     SITLA also submitted relevant comments during each of the respective comment periods.

17.     Although all plaintiffs provided detailed comments, BLM did not make a single change to its Preliminary Reconsideration Decision.

18.     On November 23, 2022, the State of Utah, Emery County and SITLA filed with the IBLA an appeal and Petition for Stay of the DR. (Reconsideration of Routes as Required by the 2022 Settlement Agreement (DOI-BLM-UT-G020-2018-0004-EA)). IBLA 2023-0061.

19.     After the IBLA denied the Petition for a Stay the State of Utah, Emery County and SITLA voluntarily dismissed their appeal before the IBLA.  IBLA 2023-0061.

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

question); 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 1361 (mandamus); the Federal

Land Policy Management Act (FLPMA), 43 U.S.C. §§ 1701-1784; the National Environmental

Policy Act (NEPA), 42 U.S.C. §§ 4321-35; and the federal Administrative Procedure Act (APA), 5

U.S.C. § 706.

21.     Judicial review of Defendants' actions is also available under the doctrine of non-

statutory judicial review of agency action because Defendants have acted without statutory

authority and the challenged actions are unlawful and *ultra vires.*

22.     The APA also authorizes judicial review of Defendants' actions because Defendants

have acted contrary to law and without lawful authority, 5 U.S.C. § 706(2)(C), and arbitrarily,

capriciously, and not in accordance with law. 5 U.S.C. § 706(2)(A).

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the San

Rafael Desert TMA is situated within the State of Utah.

## PARTIES

24.     The State of Utah is one of fifty sovereign states forming the United States of

America, having been admitted to the Union on January 4, 1896, on an equal footing with the original

states. The executive power of the State is vested in the Governor, who is responsible for seeing that

the laws of the State are faithfully executed. Utah Const. art. VII, § 5; UTAH CODE ANN. § 67-1-

1.

25.     SITLA, as an agency of the State of Utah administers and manages lands owned by

the State for the benefit of Utah's public school systems.  Over 70 sections of land managed by

SITLA are located within the San Rafael Desert TMA.

26.     Plaintiff Emery County is a political subdivision of the State of Utah, located in the

central part of Utah.  The San Rafael Desert TMA lies completely within the boundaries of the

county.  The Emery County Commissioners exercise governmental authority for and on behalf of

Emery County pursuant to state law. As a political subdivision of the State of Utah, Emery County, acting through its County Commissioners, is duly vested with governmental power and authority to provide for and protect the public health, safety, and welfare of its citizens and those who travel county roads within its boundaries.

27.     Defendant Deb Haaland is the Secretary of the DOI. In her official capacity, the Secretary is responsible for upholding the Constitution of the United States and for setting public land policy in accordance with the provisions and requirements of federal law, including FLPMA.

28.     Defendant DOI is the department of the federal government to which Congress delegated the authority to administer the public lands in accordance with the Constitution of the United States and federal law.

29.     Defendant Tracy Stone-Manning is the Director of the BLM. In her official capacity, Director Stone-Manning is responsible for managing the public lands in accordance with the U.S. Constitution and federal law.

30.     Defendant Bureau of Land Management is the federal agency within DOI responsible for the management of public lands and minerals in Utah. The BLM manages approximately 22.9 million acres of federal surface and 23 million acres of mineral estate in Utah, including the San Rafael Desert Transportation Management Area.

## PLAINTIFFS' INTRESTS AND STANDING

### A.     Plaintiffs are Participating Cooperating Agencies

31.     The Plaintiffs participated in the process leading up to the BLM decisions that are the subject of this action, by submitting comments. 43 C.F.R. 4.410(b).

32.     The State of Utah and Emery County have been actively involved as a cooperating agency in the TMP planning process since the beginning and has significant interests that will be adversely affected by the BLM's DR and Reconsidered Travel Management Plan challenged here.

33.     In July of 2018, the State and the BLM executed a Memorandum of Understanding (MOU) specifically for the purpose of establishing and defining a cooperating agency relationship between them for the purpose of preparing a TMP for the San Rafael Desert.

34.     The MOU expressly acknowledges that the State of Utah, through the Governor's Public Lands Policy Coordinating Office (PLPCO), as a cooperating agency, has special expertise applicable to transportation management planning efforts as defined in 40 CFR 1508.15 and 1508.26. The MOU details the responsibilities and procedures agreed to by the BLM and PLPCO. A copy of the MOU is attached hereto as Exhibit 1.

35.     PLPCO actively participated in the planning process for the Original TMP and submitted four comment letters on behalf of the State dated May 24, 2019, August 15, 2019, January 13, 2020, August 26, 2022. The letters articulated the State's and County's interests and position on matters relating to the TMP.

36.     Emery County has also been actively involved as a cooperating agency in the TMP planning process since the beginning and has significant interests that will be adversely affected by the BLM's DR and Reconsidered Travel Management Plan challenged here.

**B.     Access to State-Owned Lands Managed by SITLA**

37.     Pursuant to the Utah Constitution, the State of Utah owns all property interests acquired from the United States at or after the time of statehood. UTAH CONST. Art. XX.

38.     The State of Utah holds fee title to over 70 sections of land within the San Rafael Desert TMA that are administered and managed by SITLA, in trust, for the benefit of the public-school systems in the state (Trust Lands).  Many of the roads within the TMA provide transportation and access to these Trust Lands and contribute to the economic vitality of the school systems in the state.

39.     The BLM's DR which closes approximately 195 miles of roads and road segments

7

and is challenged by this action closes and restricts access to at least six sections of Trust Lands owned by the State and managed by SITLA and will result in an adverse economic impact on these lands.

40.     The marketability and value of the affected Trust Lands will be significantly reduced. The closure of access roads severely limits the potential uses of these Trust Lands and their accessibility, thereby reducing their attractiveness to potential buyers or lessees. Continued access to these Trust Lands is paramount for fulfilling the intent of the original land grant from the United States.

41.     Specifically, the closure of the 195 miles of roads by BLM has resulted in loss of access or restriction of access to thousands of acres of Trust Lands owned by the State of Utah and managed by SITLA, which in turn will result in reduced marketability and diminished per acre value by as much as fifty percent.  The collective loss of the value of these Trust Lands will be in the hundreds of thousands of dollars.

42.     These Trust Lands previously had as many as four routes that provided access for administrative and lessee access for proper management and use. The State and SITLA stand to immediately lose their ability to fully take advantage of economic benefits of these Trust Lands due to limited or no access.

43.     In addition to the valuation loss, SITLA has very limited budgets for road maintenance. It is that way by design to maximize disbursements of revenue. Therefore, it is imperative for the State and SITLA and their Trust Lands beneficiaries that roads leading to SITLA Trust Lands be public because it allows SITLA to partner with the Emery County Road department and others to improve or maintain the roads when needed.

44.     The United States may regulate the method and route of access to state school trust lands; however, that regulation cannot prevent the State or its lessee from gaining access to its land,

nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *State of Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) (Commonly referred to as the *Cotter* Decision).

45.     BLM's DR violates the *Cotter* decision by cutting off access to at least six sections of State-owned SITLA Trust Land. All Trust Land parcels had motorized access prior to the DR and many of them had multiple routes of motorized access. The DR effectively eliminates access, which will deprive the State and SITLA of the full economic value of the land, in violation of the law.

46.      The lack of available roads, even if they are only "paper routes" (routes that are only visible on maps but are reclaimed on the ground), will substantially impair actual access to the Trust Lands and increase the amount of time and financial capital necessary for prospective lessees to access those lands. This will render those parcels "incapable of full economic development." *Id*.

**C.     Transportation System Management and R.S. 2477**

47.     The State of Utah and Emery County have regulatory authority over all motorized vehicle travel within their borders, including travel by ATVs, which constitutes a significant amount of the travel in the San Rafael Desert Transportation Management Area. See Utah Off-Highway Vehicle Act, Utah Code Ann. § 41-22-1 *et. seq*.

48.     The State and the County are joint owners of R.S. 2477 rights-of-way within Emery County, Utah. UTAH CODE ANN. §§ 72-5-302(2) (Supp. 2011) and -103(2)(b) (2004); id. §§ 72-3-103(3) (2004) and -105(3).

49.     The approximately 195 miles of roads and road segments that were closed by the BLM's DR as alleged above in paragraphs 1 through 3, are subject to R.S. 2477 rights-of-way jointly owned by the State of Utah and Emery County. Specifically, a 1.3-mile segment of the Moonshine/Saucer Basin Wells Road, designated as Emery County D Road 4060, now closed by

the BLM, is included in a quiet title action based upon R.S. 2477 currently pending before Judge

Waddoups of this Court.  See, *Emery County and the State of Utah v. United States of America,*

Case No. 2:12-cv-00429-CW (D. Utah 2012), Amended Complaint Dkt 6, paragraphs 3528

through 3540. This road is designated by the BLM as Route SD 219, Seg. 2.

**D.      Motorized Recreation and Access**

50.      It is also in the interest of the State and County to promote outdoor recreation on

federal land, including motorized recreation. See 2014 Utah State Comprehensive Outdoor

Recreation Plan ("SCORP"). The SCORP identifies a need for more OHV facilities in Emery

County. SCORP, at 36.

51.      The BLM is required under the FLPMA to coordinate land use planning with

statewide outdoor recreation plans such as the SCORP. 43 U.S.C. §1712 (9).

52.      In Utah and Emery County, in particular, outdoor recreation activities such as those

engaged in by people who travel and recreate in the San Rafael Desert, contribute more than $12

billion to the State's economy and employ more than 122,000 people. State of Utah Resource

Management Plan at 180 ("State RMP") (https://rmp.utah.gov/state-of-utah-resource-management-

plan/). In Emery County, travel and tourism constitute 18.2 percent of all jobs. *Headwaters*

*Economics 2019 Economic Profile System: Travel and Tourism* (Available online:

https://headwaterseconomics.org/tools/economic-profile-system/#agriculture-report-section (last

visited 04/09/2021)).

53.      The closure of roads by the DR in the San Rafael Desert will directly impact all

activities in a large area of Emery County and adversely affect economic and tax revenue for the

County and State.

54.      Local businesses that rent ATVs or offer guided tours to visitors provide

employment to local residents and tax revenue to both the State and County.

55.     The State and County have an interest in the economic well-being of their citizens. Motorized vehicle travel on the roads in the San Rafael Desert TMA provides access not only to federal public lands, but to private lands and state Trust Lands. This access is important to the economy of the County and the State. The roads in the TMA provide access for multiple uses including livestock operations, rangeland management and monitoring, infrastructure maintenance, wildlife management and recreation. Access for activities such as the placement of salt licks, livestock gathering, and range improvement maintenance is important to the livestock business in the County and the State. Access near wilderness areas, wilderness study areas, and lands with wilderness characteristics is of particular concern since these lands are by their very nature difficult to access. It is critical that existing roads in these areas remain open to preserve existing rangeland uses. The DR directly affects livestock grazing allotments.

**E.     Livestock Grazing and Agriculture**

56.     The State, as a sovereign, has an interest in seeing its laws applied with respect to grazing on federal public lands, including grazing in the San Rafael Desert TMA.

57.     State policy, codified in state law, directs that public lands should be managed for domestic sources of food, and provide habitat for domestic animals.  UTAH CODE ANN. §63L-8-104(1)(d).

58.     State law further declares "livestock grazing on public lands is important for the proper management, maintenance, and health of public lands in the state." UTAH CODE ANN. §4-18-101(4). State law therefore supports the Plaintiffs' interest and standing to challenge the BLM's DR by this action.

59.     The State derives an economic benefit from the continuation of livestock grazing on federal public lands including cattle grazing in the San Rafael Desert TMA.

60.     Livestock grazing is a key piece of the overall economy of the State. For example,

in Utah, agricultural employment constitutes 1 percent of all jobs in the State (compared to 1.3 percent nationwide) and produces over $2,085,535,000 in cash receipts per year.  Headwaters Economics. 2019. Economic Profile System: Agriculture. Available online:

https://headwaterseconomics.org/apps/economic-profile system/49000 (last accessed September 23, 2021).

61.    Of the total agricultural cash receipts, the sale of cattle and calves account for $377,979,000. 2017 Census of Agriculture. 2017. State Profile: Utah. Available online:

https://www.nass.usda.gov/Publications/AgCensus/2017/

Online_Resources/County_Profiles/Utah/cp99049.pdf (last accessed September 23, 2021).

62.    These dollar amounts underscore the importance that agriculture, and particularly livestock grazing, plays in the Utah economy.

63.    More specifically, public land grazing plays a large role in ensuring the vitality of Utah's livestock grazing industry.

64.    Emery County also benefits economically from livestock grazing on federal grazing allotments within the San Rafael Desert Travel Management Area.

65.    Livestock grazing is critical to the economy of Emery County, including the communities of the county.

66.    In Emery County, agricultural employment constitutes 11.9 percent of all jobs and produces over $22,678,000 in cash receipts per year.  Headwaters Economics. 2019. Economic Profile System: Agriculture. Available online: https://headwaterseconomics.org/apps/economic-profile system/49015 (last accessed September 23, 2021).

67.    Of the total agricultural cash receipts, the sale of cattle and calves accounts for $8,397,000. 2017 Census of Agriculture. 2017. County Profile: Emery County, Utah. Available online: https://www.nass.usda.gov/Publications/

AgCensus/2017/Online_Resources/County_Profiles/Utah/cp49015.pdf (last accessed September 23, 2021).

68.     The median household income for Emery County is $61,893 per year, which is lower than the State's median household average of $75,705, and underscores the importance that agriculture, and particularly livestock grazing, plays in that local economy.  Utah Department of Workforce Services. 2019. Income and Wages. Available online: https://jobs.utah.gov/wi/data/library/wages/annualprofilewages.html (last accessed September 23, 2021).

69.     As set forth above, livestock grazing plays a key role in the economies of not only Emery County, but the State of Utah as a whole. Further, with urbanization continually swallowing available agricultural land within the State, livestock grazing on federally administered lands becomes even more important to agriculture in the State and Emery County.

70.     Of the 45 million acres of grazing lands within the State of Utah, 73 percent are federally owned, 9 percent is state owned, and 18 percent is privately owned. *See* Utah State Resource Management Plan, 22, *available at:* https://rmp.utah.gov/state-of-utah-resource-management-plan/ (2018).

71.     Of the federal land on which grazing is permitted, 67 percent is managed by the BLM." *Id.* Because of this, the BLM plays an oversized role in ensuring the continued success of livestock grazing in Utah.

72.     In Utah, "grazing has declined on BLM lands by more than 66 percent" over the course of the past century. *Id.* at 23. The  DR and closure of roads in the San Rafael Desert TMA challenged in this action will further diminish access and contribute to the decline of grazing on public land to the economic detriment of plaintiffs.

**F.     Wildlife Management and Control**

73.     The United States Supreme Court has long recognized that states as sovereign

entities have the power and right to control and managed wildlife within their borders. *Greer v. Connecticut*, 161 U.S. 519 (1896). This state ownership doctrine is still a legitimate basis for the exercise of state authority.

74.     Pursuant to Utah Code Annotated Section 23-13-3, all wildlife within the State of Utah . . . is the property of the State. The State has primary responsibility for the management of wildlife within its borders and receives economic benefits from the issuance of hunting and fishing licenses and permits to outdoor sportsmen. *See generally* UDWR, Fiscal Year 2020 Financial Information, Utah Division of Wildlife Resources, *available at:* https://wildlife.utah.gov/dwr-financial-overview.html (2020), (last accessed September 29, 2021).

75.     The decreased access to the San Rafael Desert Travel Management Area caused by BLM's DR and closure of roads challenged by this action diminishes and negatively affects the State's interest in and ability to manage wildlife.

## STATUTORY AND REGULATORY FRAMEWORK

### A. The Wilderness Act

76.     The Wilderness Act of 1964 was enacted "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." Management of these wilderness areas was to be done in "such manner as will leave them unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

77.     The Wilderness Act process for adding lands to the National Wilderness Preservation System ("NWPS") begins with recommendations to the President from the secretary of either the Departments of Agriculture or Interior. The President then makes a recommendation to Congress, which reserved to itself the power to designate wilderness. Specifically, the Wilderness Act states that "no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter

or by a subsequent Act." *Id*.

78.     The Act defines wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain" and "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvement or human habitation." A qualifying area is defined as an area that:

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, education, scenic, or historical value.
> *Id*. § 1131(c).

## B.  The Federal Land Policy Management Act

79.     Congress enacted FLPMA, 43 U.S.C. § 1701–1787, to establish uniform and coherent administration of public lands. This Congressional mechanism includes the (1) creation of resource inventories and land use plans, (2) implementation of "multiple use" management plans, (3) management of lands recommended for inclusion in the NWPS as Wilderness Study Areas ("WSAs"), and (4) designate and manage Areas of Critical Environmental Concern ("ACECs") according to land use plans.

### 1.  Inventory and Land Use Plans

80.     Section 201 of FLPMA requires the Secretary of the Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). This inventory is to be kept current in order to reflect any changed conditions and to "identify new and emerging resource and other values." *Id.*

81.     In addition to the requirement to prepare an inventory, FLPMA requires that "[t]he preparation and maintenance of [the] inventory or the identification of such areas shall not, of itself,

change or prevent change of management or use of public lands." *Id*. (emphasis added).

82.    Section 202 of FLPMA requires the Secretary of the Interior, with public participation, to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id*. § 1712(a). In developing these land use plans, currently known as Resource Management Plans (or RMPs), the BLM must rely "on the inventory of the public lands, their resources, and other values." *Id*. § 1712(c)(4).

83.    FLPMA also requires the Secretary of the Interior to "coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of . . . the State and local governments within which the lands are located…" *Id*. § 1712(c)(9).

84.    Moreover, the Secretary of the Interior:

shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non- Federal lands. Such officials in each State are authorized to furnish advice to the Secretary [of the Interior] with respect to the development and revision of land use plans [and] land use guidelines. . . for the public lands within such State and with respect to such other land use matters as may be referred to [the Secretary of the Interior] by them.

*Id*.

**2.  Multiple Use and Sustained Yield**

85.    As set forth in FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a).

86.    "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id*. § 1702(c).

87.    These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

88.     "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a

high-level annual or regular periodic output of various renewable resources of the public lands

consistent with multiple use." *Id*. § 1702(h).

89.     As set forth in FLPMA, the "principal or major uses" of public lands include and are

limited to "domestic livestock grazing, fish and wildlife development and utilization, mineral

exploration and production, rights-of-way, outdoor recreation, and timber production." *Id*. §

1702(l).

### 3.  Wilderness Study Areas

90.     Wilderness Study Areas, or WSAs, are those lands inventoried and identified by

BLM as suitable for preservation as wilderness, subject to prior existing rights and uses. 43 U.S.C.

§ 1782(c).

91.     Because the Wilderness Act does not directly address BLM's authority to designate

or manage public lands as wilderness, FLPMA section 603 provides for a two-step inventory and

management process.

92.     First, within fifteen years of October 21, 1976, passage of FLPMA, the Secretary of

the Interior was to use the section 201 Inventory to review "roadless areas of five thousand acres or

more and roadless islands of the public lands." During that fifteen-year period, the Secretary of the

Interior was required "from time to time [to] report to the President his recommendation as to the

suitability or nonsuitability of each area or island for preservation as wilderness." *Id*. § 1782(a).

93.     On October 21, 1991, BLM's authority to review, recommend, create, or manage

lands as WSAs terminated. *Id*.

94.     Second, the President was to advise Congress within two years of each report by the

Secretary of the Interior of "his recommendations with respect to designation as wilderness of each

such area. . .." *Id*. § 1782(b).

95.     As stated above, only Congress has the discretion to either designate WSA lands as part of the NWPS or to release them for other uses.

96.     Prior to congressional determination, management of recommended WSAs must be done in "a manner so as not to impair the suitability of such areas for preservation as wilderness," subject to prior existing rights and uses (the non-impairment standard). *Id*. § 1782(c).

97.     Pursuant to FLPMA section 302(b), BLM is to manage all other lands to the lesser undue degradation standard.

98.     On December 12, 1979, BLM issued an Interim Management Policy for Lands Under Wilderness Review ("IMP") to provide management guidance to BLM staff for section 603 WSAs pending congressional action.

### 4. Areas of Critical Environmental Concern

99.     FLPMA defines Areas of Critical Environmental Concern (ACEC) as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a).

100.    Under FLPMA section 201, the Secretary of the Interior must give priority to ACECs in the inventory of public lands. *Id*. § 1711(a).

101     Under FLPMA section 202, the designation and protection of ACECs are given priority in the development and revision of land use plans. *Id*. § 1712(c)(3).

102.    Prior to designating an ACEC, the BLM State director must provide a 60-day period for public comment on the proposed designation. 43 CFR § 1610.7-2(b).

### 5. Rules and Regulations

103.    To carry out the purposes of FLPMA, the Secretary of the Interior is required to

promulgate rules and regulations. "The promulgation of such rules and regulations shall be governed by the provisions of chapter 5, title 5," the Administrative Procedures Act, 5 U.S.C. §§ 500-596. 43 U.S.C. § 1740.

104.    In 1971, DOI promulgated a rule to follow rulemaking procedures, even if the subject matter would fall within APA exceptions. Specifically, DOI stated that "[n]otice is hereby given of the policy of the Department of the Interior to give notice of proposed rulemaking and to invite the public to participate in rulemaking in instances where not required by law." 36 Fed. Reg. 8336 (May 4, 1971).

**C.    The National Environmental Policy Act**

105.    Congress enacted NEPA to "encourage the enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate health and welfare of man; to enrich the understanding of the ecological and natural resources important to the Nation…" 42 U.S.C. § 4321.

106.    To achieve these goals, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1501.4 and BLM NEPA Handbook, H-1790-1, 3.2.1 (Jan. 30, 2008) (discussing NEPA process).

107.    NEPA defines "major Federal actions" triggering NEPA analyses as "new or revised" agency "plans, policies, or procedures" including, as in the case of Order 3310, "formal documents establishing an agency's policies which will result in or substantially alter agency programs" and "which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. 1508.18(b)(1).

108.    The "human environment" is defined to "include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14.

Furthermore, when economic and social effects are interrelated with natural and environmental effects, "then the environmental impact statement will discuss all of these effects on the human environment." *Id*.

109.   The EIS must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. This open process of evaluation allows all stakeholders to know the implications of federal actions and have the ability to participate and have their voices heard in the decision-making process.

**D.      Administrative Procedures Act.**

110.   Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations. The APA also establishes a process for judicial review of agency decisions.

**1.  Rulemaking**

111.   Rulemaking procedures are clearly laid out in the APA and require both notice and the opportunity to comment. 5 U.S.C. § 553.

112.   Notice of proposed rulemaking is to be published in the Federal Register and must include "(1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. § 553(b).

113.   After providing notice, an agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(b)(3)(A).

114.   Except as otherwise required by statue, the APA provides an exception to the notice and comment requirements for "interpretive rules, general statements of policy, or rules of agency

organization, procedure, or practice."

115.     Courts will overturn a rule purporting to exist under this exception if it was promulgated pursuant to a direct delegation of legislative power by Congress or "if it changes existing law, policy or practice." *Rocky Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992).

### 2.  Judicial Review

116.     The APA also establishes a procedure for judicial review for those who are suffering a legal wrong as the result of a final agency action and have no other adequate remedy. *Id*. § 704.

117.     The reviewing court may decide "all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id*. § 706.

118.     The court shall, among other things "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . [or] without observance of procedure required by law." Id. § 706(2)(A) and (C)-(D).

### E.    R.S. 2477

119.     R.S. 2477 provides as follows: "And be it further enacted That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy Management Act of 1976 (FLPMA), Pub. L. No. 94-579 § 706(a), 90 Stat. 2743.

120.     R.S. 2477 was an open congressional grant *in praesenti* of public highway rights-of-way for the benefit of miners, ranchers, homesteaders, and all other members of the public who had

a need to travel across public lands.

121.     Acceptance and vesting of R.S. 2477 rights-of-way required no administrative formalities: no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested. See *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 741 (10th Cir. 2005) (hereinafter "SUWA v. BLM"). R.S. 2477 operated as a standing offer of a right-of-way over the public domain, and the grant may be accepted without formal action by public authorities. *Id.*

122.     The congressional grant of public highway rights-of-way embodied by R.S. 2477 operated on unreserved public lands for 110 years until it was repealed on October 21, 1976, by the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et. seq*.

123.     In repealing R.S. 2477, Congress preserved vested R.S. 2477 rights-of-way as valid existing rights and expressly directed the United States and its subordinate agencies (including the DOI and the BLM) to manage federal lands subject to these valid existing rights.

124.     Section 701(h) of FLPMA provides as follows: "All actions by the Secretary concerned under this Act shall be subject to valid existing rights." *Id*. § 1701, note; see also *Id*. § 1769(a) ("Nothing in this subchapter shall have the effect of terminating any right-of-way or right of use heretofore issued, granted or permitted.").

125.     In *SUWA v. BLM*, the 10th Circuit clarified that in FLPMA, Congress "explicitly preserved and protected R.S. 2477 rights of way in existence as of October 21, 1976, and …those rights have the status of vested real property rights."  *SUWA v. BLM*, 425 F.3d 760.  In a recent decision regarding R.S. 2477 roads in Kane County, in a case commonly referred to as *Kane (2)*, this Court found that "[t]he federal agency is not entitled, under the FLPMA and the Administrative Procedures Act (APA), to close existing county roads asserted to be R.S. 2477 rights-of-way without a

reasoned and nonarbitrary basis for doing so, such as . . . substantial evidence that the asserted right-of-way is invalid. These rights are protected under FLPMA, and any attempts to nullify them are contrary to the law." *Kane Cnty v. U.S.*, 2:10-cv-01073-CW, Dkt. 792, at 33 (Memorandum Decision and Order Re: Motions to Dismiss and Definition of "Holder")(D. Utah Aug. 9, 2024)(hereinafter "Kane (2) Decision")(citing *Kane Cnty., Utah v. Salazar,* 562 F.3d. 1077, 1090 (10th Cir. 2009)(Henry, J., concurring).

126.    This Court further found in the recent *Kane (2)* decision that the BLM in its travel management planning must treat the State and its counties as holders of vested title rights in R.S. 2477 rights-of-way, even if the title has not yet been adjudicated or perfected in court.  *Id*, at 24.  This Court also found that "when there is no dispute about the title, the United States cannot require adjudication by a court before one is treated as an R.S. 2477 holder."  *Id*, at 27.  The BLM has repeatedly denied that there is any dispute about the title of R.S. 2477 roads, even when closing them through administrative processes.

## FACTS RELATING TO BLM DECISION TO CLOSE ROADS

127.    The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

128.    A thorough analysis of the specific facts underlying BLM's decision reveals that the BLM acted arbitrarily and capriciously in deciding which roads to close and which roads to keep open.

129.    The Road identified in the EA as SD520 was left open during BLM's reconsideration process but is in the same condition or even less traveled and defined than many of

the routes considered "reclaimed or reclaiming" under the DR.  See Exhibit 2, attached hereto.

130.    Road SD520 is substantially similar to SD788, SD536, and SD516 that were initially open under the TMP but have been closed under the DR. Those routes, like others, are listed as being appropriate for closure to minimize damage to resources documented in the area.

131.    Closed routes SD788, SD536, and SD516 are in an area that is prominently black brush and blow sand, just like SD520; they are all typically one windy or rainy season away from having their track marks that reveal route usage reclaimed.

132.    BLM does not reference in the Administrative Record any specific species or other resources that would be impacted if they were designated as open; there is nothing to significantly distinguish routes SD788, SD536, and SD516 from SD520 that has been left open, demonstrating the arbitrary and capricious nature of the decision-making process.

133.    The road identified as SD685b was left open under the original 2020 TMP but is now designated as OHV closed after being preliminarily designated as closed after the Settlement Agreement.

134.    The stated reason for closure of SD685b in the DR is to protect habitat for managed and special status species, wilderness character, and native pollinators; however, as shown in Exhibit 3, attached hereto, the route goes through a grove of invasive tamarisks that should be managed under various federal laws rather than protected through route closures. Invasive species are not beneficial for managed or special status in this area nor are they typically targets for native pollinators.

135.    The road designated as SD1027, Segment 2, provides access to a scenic and unique area that overlooks the Green River.

136.    As shown in Exhibits 4a and 4b, attached hereto, Segment 2 of road SD1027 is far from reclaimed; it is actually in very good condition and provides access to remarkable views for a

wide range of recreationalists, including basic four-wheel drive vehicles.

137.   The rationale for closing road SD1027 is nearly identical to the rationale used for closing road SD1050. The difference is that road SD1050 doesn't actually exist on the ground, has been fully reclaimed and not even a remnant or segment is visible.

138.   The fact that these two roads (SD1027 and SD 1050) are being closed under an identical rationale further demonstrates the arbitrary and capricious nature of BLM's decision-making process.

139.   The road identified as SD1340, Segment 1 (See Exhibit 5, attached hereto) is being closed primarily because it is a redundant route; however, the important difference between this and other roads is that it provides a vastly different recreational experience to the roads it parallels.

140.   Road SD1340 is visible and easily identifiable on the ground, as evidenced in Exhibit 5. It provides a more rugged all terrain experience, whereas the parallel routes provide a much easier and novice friendly experience.

141.   Based on the inadequate record the BLM's DR failed to adhere to the BLM's own rules and regulations.

142.   BLM improperly reversed its previous NEPA process. The same NEPA process that supported keeping routes open, now, without any articulated changes to the record, supports the full closure of 195 miles of previously open routes.

143.   Absent justification within the Administrative Record, the decision to close the approximately 195 miles of routes in the TMP that were previously designated as open is arbitrary and capricious, as well as illegal and *ultra vires*.

144.   The DR closes access to at least six sections of Trust Lands owned by the State of Utah and managed by SITLA. Continued access to these sections of Trust Lands is paramount for fulfilling the intent of the original land grant from the United States.

145.     The United States may regulate the method and route of access to state school trust lands; however, that regulation cannot prevent the State or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *State of Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) (Commonly referred to as the *Cotter* Decision).

146.     The DR violates the *Cotter* decision by cutting off access to at least six sections of SITLA Trust Land. All of the parcels had motorized access prior to the DR and many of them had multiple routes of motorized access. The DR effectively eliminates access, which will deprive the State of the full economic value of its land, in violation of the law.

147.     The lack of available roads, even if they are only "paper routes" (i.e., routes that are only visible on maps but are reclaimed on the ground), will substantially impair actual access and increase the amount of time and financial capital necessary for prospective lessees to access those lands. This will undoubtably render those parcels "incapable of full economic development."

148.     On March 12, 2019, the United States Congress passed Public Law 116-9, otherwise known as the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"). John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pl 116-9, March 12, 2019, 133 Stat 580. Among other things, the Dingell Act designated 18 wilderness areas in Emery County, including the Labyrinth Canyon Wilderness located within the San Rafael Desert Travel Management Area. *Id*. at Section 1231, 133 Stat. 71. As part of the process, an Overview Map dated February 5, 2019, was created, and memorializes route number SD598 as an open "State Route." *Id*. At 133 STAT. 667.

149.     The BLM, an executive agency, by its DR, has now closed this congressionally designated open route.

150.     This closure, regardless of the condition or use of the route, is contrary to expressed

congressional intent as reflected by the Overview Map designating the Labyrinth Canyon

Wilderness. This is an illegal overreach of power. The BLM cannot at the administrative level

override congressional action.

151.    FLPMA requires the BLM to manage public lands according to multiple use and

sustained yield principles, in order to "meet the present and future needs of the American people."

See 43 U.S.C. 1701(a)(7), and 1702(c). These uses include domestic livestock grazing, which is

defined as a "principal or major use." *Id*. at (1).

152.    Under FLPMA, lands within the TMA must be managed to protect rangeland

improvements and promote domestic livestock grazing. *Id.*

153.    Many of the routes were closed in the DR considered only conservation and failed

to take into account grazing, recreation, and other multiple uses.

154.    Keeping existing routes open helps accomplish the goal of "minimization of

conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Transportation connectivity

reduces in and out traffic and can spread out use. Additionally, keeping roads open provides the

traveling public access while reducing the need and desire to pioneer new and unauthorized routes.

155.    The DR violates FLPMA by failing to manage the public lands according to the

standards set forth in the immediately preceding paragraphs.

156.    Under FLPMA, when developing or creating Resource Management Plans, the

BLM is required to coordinate state and local government plans. 43 U.S.C.A. § 1712.

157.    The BLM also is required in the development of land use plans to ensure that

consideration is given to the applicable state, local, and tribal plans "and to resolve, to the extent

practical, inconsistencies between Federal and non-Federal Government plans." *Id.*

158.    FLPMA further mandates that BLM land use plans "shall be consistent with state

and local plans to the maximum extent [the Agency] finds consistent with federal law and the

purposes of this Act." *Id.*

159.    In addition to the coordination and consistency requirements, CEQ regulations require federal agencies to discuss the conflicts between the proposed action and the objectives of state and local plans. 40 CFR § 1502.16.

160.    The State of Utah and Emery County both have duly adopted resource management plans. County Resource Management Plan ("CRMP"). Utah State Resource Management Plan, ("Utah SRMP"), Introduction, *available at:*

https://storymaps.arcgis.com/collections/81d4406668e34acca4d98275ee41cd07?item=1(2022), PLPCO, *Resource Management Plans by County*, Utah's Public Lands Policy Coordinating Office, *available at:* https://rmp.utah.gov/county-resource-plans/ (2021).

161.    The CRMP and Utah SRMP include locally adopted objectives and policies for federal land management and include findings, provisions, and policies relating to natural resource development and environmental quality relevant to the current planning process.

162.    In addition to the CRMP and Utah SRMP, Utah Code Title 63J also establishes the State's position that BLM land-use plans should: support valid existing transportation . . . privileges on federal land at the highest reasonably sustainable levels, and     keep open to motorized travel, any road in the subject lands that is part of the respective counties' duly adopted transportation plan.

163.    BLM has failed to follow the provisions of FLPMA and the Dingell Act; its DR is inconsistent with the CRMP and Utah SRMP, and BLM completely failed to discuss these inconsistencies or make any attempt to resolve them.

164.     NEPA requires that BLM allow cooperating agencies a meaningful opportunity to participate in the reconsideration process as required in 40 C.F.R. 1501.8. Specifically, NEPA requires cooperating agencies be allowed to participate in the NEPA process at the earliest

practicable time. 40 C.F.R. 1501.8(b)(1).

165.    BLM is required to use the environmental analysis and proposals of cooperating

agencies… to the "maximum extent practicable" and "shall develop a schedule, setting milestones

for all environmental reviews and authorizations required for implementation of the action, in

consultation with… cooperating agencies as soon as practicable". 40 C.F.R. 1501.7 (h)-(i).

166.    BLM held a meeting with the cooperating agencies less than 24 hours before the

planned release of the reconsideration plan for public comment.  The meeting was informational

only. Maps were shown but not disseminated to cooperating agencies and the BLM did not ask for

the advice, opinion, or any meaningful input from those present.  BLM representatives indicated

that they could not provide additional time for the cooperating agencies to review and consult

further on the reconsideration, prior to or even during the public comment period, due to the

deadline imposed in the settlement agreement.

167.    Plaintiffs' representatives made a verbal request at the meeting and a written request

dated July 8, 2022, asking for additional time to provide meaningful comment. These requests were

denied.

168.    BLM violated NEPA by failing to implement to the maximum extent practicable or

even consider the analysis and proposals of cooperating agencies.  BLM disregarded the input of

cooperating agencies and not only closed all routes proposed in the Preliminary Reconsideration

but closed three additional roads, SD308, SD312, and SD333, that were not initially disclosed.

169.    BLM further violated the law by failing to consider the requirement that access be

provided to State-owned Trust Lands managed by SITLA under the *Cotter* decision as well as

access to a road congressionally designated as open under the Dingell *Act*.

170.    The DR was the direct result of a Settlement Agreement reached in the case of

*Southern Utah Wilderness Alliance v. U.S. Department of Land Management, et. al.*, Case No.

2:21-cv-0091-DAK-JCB in which SUWA challenged six RMPs developed by the BLM in 2008 (the RMP Settlement Agreement).  Paragraph two of the RMP Settlement Agreement required that the BLM comply with applicable law, including OHV regulations at 43 C.F.R. Part 8340 and NEPA. Paragraph five of the Settlement Agreement requires that the BLM consult with interested user groups, federal, state, county and local agencies, local landowners, and other parties in a manner that provides an opportunity for the public to express itself and have its views given consideration, in accordance with 43 C.F.R. 8342.2(a).

171.    The BLM violated the RMP Settlement Agreement and NEPA by failing to substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a). The OHV regulations are merely mentioned in passing in the DR, with no showing of compliance.

172.    The BLM's DR closes motorized access to 195 miles of roads where Plaintiffs have pre-1976 vested property rights, in violation of FLPMA Sec. 701(a).  43 U.S.C. 1701.

173.    Because acceptance and vesting of R.S. 2477 rights-of-way required no administrative formalities of formal act of public acceptance by the United States, the rights-of-way for the 195 miles of R.S. 2477 roads within the BLM's TMA vested upon the roads receiving at least ten years of continuous public use.  *See SUWA v BLM*, 425 F.3d 735, 741 (10th Cir. 2005).

174.    In its recent *Kane (2)* decision, this Court has ruled that, with regard to R.S. 2477 roads, the State and Counties have done all that was required by Congress, and unless the United States disputes title, it has an obligation to treat the State and Counties in the same manner as it did prior to October 21, 1976, for the roads at issue."  *Kane (2)* Decision, at 29.  The BLM's DR completely fails to take into consideration any R.S. 2477 assertions.

175.    In the recent *Kane (2)* decision, this Court considered the BLM's closure and control of R.S. 2477 roads in the Monument Management Plan for the Grand Staircase-Escalante National Monument.  *Kane (2)* Decision, at 54.  Similar to the BLM's DR here, the BLM's Monument

Management Plan disregarded the State's vested rights under R.S. 2477. *Id*, at 55. In the Monument Management Plan, the BLM altered the status of the State and Kane County's existing rights by moving all roads under its jurisdiction and authority and by controlling whether a road will be opened or closed. *Id*, at 57. This Court, citing *Salazar*, found that "the BLM is not entitled 'to make unilateral changes in the status quo without first considering the legitimate interests of the other.'" *Id.*, citing *Kane Cnty., Utah v. Salazar,* 562 F.3d. 1077, 1091 (10th Cir. 2009) (Henry, J., concurring). Since the BLM had failed to consider the legitimate vested property interests of the State and Kane County, this Court found that the BLM Monument Management Plan unlawfully regulated the valid, existing rights of the State and Kane County as holders of R.S. 2477 rights-of-way. *Id*, at 57.

176. In the present case, the BLM is similarly failing to consider the legitimate vested property interests of the State and County in the San Rafael Desert TMA, and seeking to unlawfully regulate the State's valid existing rights.

177. In developing the TMP for the San Rafael Desert TMA, the BLM did not consider any R.S. 2477-related evidence. If the BLM wishes to treat the State as a non-holder of its vested R.S. 2477 property rights, it must first dispute the State's title. *Kane (2)* Decision, at 29. Since the BLM has at present failed to dispute the State's title to the R.S 2477 roads with the BLM's TMA, the BLM must treat the State as a title holder and provide motorized access to all R.S. 2477 roads within the TMA.

178. NEPA requires federal agencies to take a hard look at the environmental consequences of an action requiring NEPA review. *Kleppe v. Sierra Club,* 427 U.S. 390 (1976).

179. During the development of the Environmental Assessment for the San Rafael Desert TMP and the BLM's reconsideration process, the State, acting at times both as a Cooperating Agency and as a participant in the public comment periods, urged the BLM to consider its interests. See paragraphs 12 through 17, above.

180. Despite the State's requests, the BLM failed to consider the State's interests, including its vested rights under R.S. 2477. The State's input was ignored throughout the planning

process.

181.     In the *Kane (2)* decision, this Court recently held that the BLM's failure to treat any road as being an R.S. 2477 right-of-way absent judicial adjudication constitutes "an implicit dispute of the State and Kane County's title because such unilateral decision making is contrary to the rights of a holder." *Kane (2)* Decision, at 58.  In this case, the BLM also failed to treat any road in the TMA as an R.S. 2477 road, despite the State's valid claims, while also refusing to dispute the State's title.  The BLM is trying to have it both ways, failing to analyze the State's vested title claims while also refusing to dispute the title for jurisdictional reasons.  This Court in the *Kane (2)* decision described this technique as "a course of action to shut the courthouse doors to Plaintiffs [i.e. the State and counties] seeking to perfect titles to roads that are key to Plaintiffs' transportation systems." *Id.* at 11.  The BLM has failed to take a hard look at the significant consequence of its DR on the vested property rights of the State, despite clear requests by the State to do so, in order to satisfy the BLM's own jurisdictional purposes.  This abrogates the very purpose of performing NEPA analysis for a BLM TMP and taking a hard look at the consequences of the agency action.  The San Rafael Desert DR should be set aside until the BLM takes a necessary hard look at the consequences closure of R.S. 2477 roads will cause to the State's vested property rights.

182.     In *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005), the Tenth Circuit Court of Appeals stated that because "FLPMA explicitly preserved and protected R.S. 2477 rights of way in existence as of October 21, 1976, and that those rights have the status of vested real property rights, any post-1976 changes in agency interpretation of the repealed statute have questionable applicability." *Id*. at 760.  The court further noted that "it is hard to square . . . law-changing discretion with the concept of property rights that vested, if at all, on or before a date almost 30 years ago." *Id*.

183.      In *Block v. North Dakota ex rel. Bd. Of University and School Lands*, 461 U.S. 273

(1983), the United States Supreme Court stated that the Quiet Title Act (QTA) "does not purport to effectuate a transfer of title." The Court also noted that even in situations where the QTA statute of limitations has run, the QTA "does not purport to strip any State, or anyone else for that matter, of any property rights." *Id*. at 291. The Court also opined that if Congress had done so by statute, it "would have constituted a taking of the State's property without just compensation, in violation of the Fifth Amendment. *Id.*

184.    The BLM DR's closure of 195 miles of roads that are subject to R.S. 2477 rights of way held by the State and Emery County and have the status of vested real property rights, constitutes a taking of property of the State and Emery County, in violation of the Fifth Amendment to the United States Constitution.

185.    This Court in the *Kane (2)* decision, stated that "Until title is perfected under the Quiet Title Act, the United States retains that right to challenge a claim to vested title, but such challenge must be done through the QTA and not through an informal policy of the United States. It also must be done as a good faith dispute, rather than as a means to circumvent R.S. 2477 rights. See Kane Cnty., Utah v. Salazar, 562 F.3d 1077, 1090 (10th Cir. 2009) (Henry, J. concurring) (stating "[t]he federal agency is not entitled, under the FLPMA and the Administrative Procedures Act (APA), to close existing county roads asserted to be R.S. 2477 rights-of-way without a reasoned and nonarbitrary basis for doing so, such as . . .substantial evidence that the asserted right-of-way is invalid.")." *Kane Cnty v. U.S*., 2:10-cv-01073-CW, Dkt. 792, at 33 (Memorandum Decision and Order Re: Motions to Dismiss and Definition of "Holder")(D. Utah Aug. 9, 2024)

## FIRST CAUSE OF ACTION
*Violation of Federal Case Law: Diminished Access to State-owned Land managed by SITLA*

186.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 185.

187.    As alleged above, BLM's DR closes access to at least six sections of property

owned by the State of Utah and administered by SITLA, which will result in a direct adverse economic impact. Specifically, BLM's DR will result in loss of access or restriction of access to thousands of acres of property, which in turn will result in reduced marketability and diminished per acre value by as much as fifty percent.  The collective loss of the value of these lands will be in the hundreds of thousands of dollars.

188.    Continued access to these sections is paramount for fulfilling the intent of the original land grant from the United States. The closure of access roads severely limits the potential uses of these lands and their accessibility, thereby reducing their attractiveness to potential buyers or lessees.

189.    The United States may regulate the method and route of access to state school trust lands; however, that regulation cannot prevent the state or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *State of Utah v. Andrus*, 486 F. Supp. 995 (D. Utah 1979) (Commonly referred to as the *Cotter* Decision).

190.    BLM's DR violates the *Cotter* decision by cutting off and diminishing access to at least six sections of lands owned by the State of Utah and administered by SITLA.

191.    Those sections had motorized access prior to the DR and many of them had multiple routes of motorized access. The DR effectively eliminates access, which will deprive the State and SITLA of the full economic value of their land, in violation of the law.

192.    BLM may consider that this decision does not impact the State-owned SITLA parcels to the extent prohibited by the *Cotter* decision; however, the lack of available roads, even if they are only "paper routes" (i.e. routes that are only visible on maps but are reclaimed on the ground), will substantially impair actual access to those parcels and increase the amount of time and financial capital necessary for prospective lessees to access those lands, which will

undoubtably render those lands "incapable of full economic development." *Id*.

## SECOND CAUSE OF ACTION
*Violation of the Dingle Act*

193.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 192.

194.    On March 12, 2019, the United States Congress passed Public Law 116-9, otherwise known as the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"). John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pl 116-9, March 12, 2019, 133 Stat 580.

195.    The Dingell Act designated 18 wilderness areas in Emery County, including the Labyrinth Canyon Wilderness located within the San Rafael Desert Travel Management Area. *Id*. at Section 1231, 133 Stat. 71.

196.    As part of the process, an Overview Map dated February 5, 2019, was created, and memorializes route number SD598 as an open "State Route." *Id*. At 133 STAT. 667.

197.    The BLM's DR has closed this congressionally designated open route as part of its reconsideration process.

198.    The closure, regardless of the condition or use of the road, is contrary to expressed congressional intent, an illegal overreach of power, a violation of federal law and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706. BLM cannot at the administrative level override congressional action.

## THIRD CAUSE OF ACTION
*Violation of the APA: Unlawful Arbitrary and Capricious Action*

199.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 198.

200.    The Administrative Procedures Act authorizes the setting aside of agency action

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

201.    As set forth in detail above in paragraphs 124 through 139, a thorough analysis of specific facts underlying BLM's decision reveals that the BLM acted arbitrarily and capriciously in deciding which roads to close and which roads to keep open.

202.    BLM's DR violates federal law and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION
*Violation of FLPMA: Failure to comply with Multiple Use and Sustained Yield Mandate*

203.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 202.

204.    Under FLPMA, the guiding principle in the management of the public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a).

205.    "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people" *Id*. § 1702(c).

206.    These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

207.    "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. § 1702(h).

208.    FLPMA requires the BLM to manage public lands according to multiple use and sustained yield principles, in order to "meet the present and future needs of the American people." See 43 U.S.C. 1701(a)(7), and 1702(c). These uses include domestic livestock grazing, which is defined as a "principal or major use." *Id.* at (1).

209.    The BLM's DR closed roads based upon a rationale that only considers conservation and fails to take into account livestock grazing, wildlife management, motorized recreation and travel and other uses.

210.    Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Transportation connectivity reduces in and out traffic and can spread out use. Additionally, keeping roads open provides the traveling public access while reducing the need and desire to pioneer new and unauthorized routes.

211.    BLM's DR violates FLPMA by failing to manage the public lands of the San Rafael Desert Management Area in accordance with principles of multiple use and sustained yield and is arbitrary, capricious, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706.

### FIFTH CAUSE OF ACTION
*Violation of FLPMA and other Federal Statutes: Unlawful De Facto Wilderness Management on Non-WSA Lands*

212.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 211.

213.    Constitutional authority to classify and manage public lands resides with Congress. United States Constitution, Article IV, Section 3 cl. 2. In various federal laws, including but not limited to Taylor Grazing Act (TGA), 43 U.S.C. §§315-315q, FLPMA, 43 U.S.C. §§1701 *et seq.*, the 1872 Mining Law, as amended, 30 U.S.C. §§20, *et seq.*, and the Mineral Leasing Laws (MLA), 30 U.S.C. §§181, *et seq.*, Congress has delegated its constitutional authority to Defendants to

manage public lands. This delegated authority is defined and limited by the terms of the respective federal statute.

214.    While the BLM's reconsideration and DR closing 195 miles of roads in the San Rafael Desert Transportation Management Area does not use the term "wilderness" to define its protective management of non-WSA lands, there is no question that the on the ground effect is to create WSA-type management.

215.    As set forth above in paragraphs 77 through 102, BLM's wilderness review authority under §603 of FLPMA, 43 U.S.C. §1782(c), has terminated, and as a result, BLM must "not manage or otherwise treat public lands, other than §603 WSAs. . . as WSAs or as wilderness pursuant to the [FLPMA] §202 process."

216.    BLM may not create §202 WSAs and may not "treat" public lands as WSAs through its land use and transportation management planning process. The BLM's DR unlawfully treats the non-WSA lands of the San Rafael Desert Transportation Management Area as a *de facto* WSA lands.

217.    Notably, FLPMA does not preclude individual protections associated with the concept of wilderness that may be afforded through the land use planning process, such as through the establishment of areas of critical environmental concern (ACECs). 43 U.S.C. §1702(a). In doing so, specific statutory and regulatory criteria, must be met, including a finding that special management attention is required to prevent irreparable damage. *Id.* Proposed ACEC designations are not a substitute for a wilderness suitability determination, nor may they be offered as a means to manage non-WSA lands as wilderness.

218.    When appropriate, BLM may also limit OHV use or establish mitigation measures, stipulations, or conditions of use to be attached to permits, leases, and other authorizations to avoid or minimize impacts to individual resource values. BLM, however, may not use the land or

transportation management planning process to create *de facto* wilderness similar to the management of WSAs to the exclusion of multiple use.

219.    BLM's reconsideration and DR treats the area of the newly closed roads as if they were WSAs and violates any sound and legally supported interpretation of FLPMA and other federal statutes.

220.    Defendants have acted arbitrarily and capriciously in issuing the BLM's DR and have closed 195 miles of roads and road segments for the sole reason that they traverse lands considered by SUWA and other environmental groups to be Red Rock Wilderness. A favorable decision from this Court will redress the legal injuries to Emery County, the State of Utah and SITLA and remove immediate barriers to multiple use of the affected public lands, including access to lands owned by the State and managed by SITLA, wildlife management, transportation management and livestock grazing and support key components of the State's and County's land use and transportation plans. Such a determination and permanent injunction will leave the Utah wilderness debate where it belongs as provided for by law, with the United States Congress.

**SIXTH CAUSE OF ACTION**
*Violation of FLPMA and NEPA: Failure to Comply with Requirements for Public Comment and Coordination with State and Local Governments*

221.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 220.

222.    In issuing the DR challenged by this action Defendants failed to follow FLPMA and NEPA, which require public notice, opportunity for comment, and coordination with and meaningful involvement of State and local governments.

223.    As required by FLPMA and NEPA and as more fully set forth in paragraphs 81 through 82 and 160 through 167 above,  DOI must "allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give

Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands." DOI must also coordinate with and provide for meaningful involvement of state and local governments "in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands." 43 U.S.C. §1712(c)(9).

224.    BLM regulations implementing FLPMA are in accord. "The public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance and be given early notice of planning activities." 43 C.F.R. §1610.2 (emphasis added).

225.    Defendants did not comply with regulations requiring them to provide meaningful notice and comment periods. Nor did they coordinate with State and local governments before announcing and implementing BLM's DR challenged by this action.

226.    As alleged above, BLM held a meeting with the cooperating agencies less than 24 hours before the planned release of the reconsideration plan. The meeting was informational only. Maps were shown but not disseminated to cooperating agencies and the BLM did not ask for the advice, opinion, or any meaningful input from those present. BLM representatives indicated that they could not provide additional time for the cooperating agencies to review and consult further on the reconsideration, prior to or even during the public comment period, due to the deadline imposed in the Settlement Agreement.

227.    Plaintiffs' representatives made a verbal request at the meeting and a written request dated July 8, 2022, asking for additional time to provide meaningful comment, which were denied.

228.    BLM violated NEPA by failing to implement to the maximum extent practicable or even consider the analysis and proposals of cooperating agencies. 40 C.F.R. 1501.8(b)(1). BLM

completely disregarded the input of cooperating agencies and not only closed every route proposed in the Preliminary Reconsideration, but designated for closure three additional roads, SD308, SD312, and SD333, that were not initially disclosed.

229.    The lack of notice, public comment, and coordination with State and local governments in the development and issuance of BLM's DR violates the legislative and regulatory mandates of FLPMA and NEPA.

<u>SEVENTH CAUSE OF ACTION</u>
*Breach of the RMP Settlement Agreement*

230.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 229.

231.    The BLM violated the RMP Settlement Agreement and NEPA by failing to comply with and substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a).

<u>EIGHTH CAUSE OF ACTION</u>
*Violation of FLPMA: Unlawful closure of roads to which the State of Utah holds vested rights-of-way*

232.    Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 231.

233.    As alleged above, R.S. 2477 provided for the construction of public highways across public land, while also providing for title to those public highways to vest with state and county governments.

234.    Upon fulfilling the public highway requirements of R.S. 2477, State and County governments became the "holders" of rights-of-way to those highways.

235.    Rights-of-way granted under R.S. 2477 were self-executing, requiring no action on the part of the federal government.

236.    Although FLPMA repealed R.S. 2477 upon its passage in 1976, FLPMA preserved

any valid lease, permit, patent, right-of-way, or other land use right or authorization existing upon the passage of FLPMA.

237.    The BLM's DR closes public motorized access on 195 miles of roads to which the State and County are the "holders" of pre-1976 vested rights-of-way under R.S. 2477.

238.    The BLM closure of rights-of-way within the TMA disturbs the State's and County's use of those vested rights-of-way.

239.    Although the State's and County's vested title in the rights-of-way within the TMA are not yet perfected and are in some cases still the subject of a pending lawsuit under the Quiet Title Act, the State and County are nevertheless holders of the rights-of-way within the TMA.

240.    The BLM has therefore violated FLPMA by closing public motorized access to roads to which the State and County hold vested title preserved by FLPMA.

## NINTH CAUSE OF ACTION

*Violation of NEPA: Failure to consider rights-of-way for which State of Utah holds vested title*

241.    Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 240.

242.    NEPA requires federal agencies such as the BLM to take "hard look" at the environmental consequences of a federal action warranting NEPA analysis.

243.    During the development of the EA for the BLM's TMP, the State and County asked the BLM to consider the impacts of road closures on their vested rights under R.S. 2477.

244.    Despite these requests, the BLM declined to even consider these impacts.

245.    BLM's failure to consider how its road closures would impact the vested rights of the State and County violates NEPA's "hard look" standard.

## TENTH CAUSE OF ACTION

*Violation of the Fifth Amendment to the Constitution: unlawful taking of property of the State and Emery County*

246.    Plaintiffs reallege and incorporate by reference all allegations contained in paragraphs 1 through 245.

246.    The BLM DR's closure of 195 miles of roads that are subject to R.S. 2477 rights of way held by the State and Emery County and have the status of vested real property rights, constitutes a taking of property, in violation of the Fifth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this court grant relief against Defendants as follows:

1.    Declare unlawful and set aside the DR and find that Defendants acted beyond their statutory authority to manage the lands accessed by the 195 miles of closed roads, that Defendants are unlawfully managing lands as *de facto* wilderness in violation of FLPMA and other federal statutes.

2.    Declare unlawful and set aside the DR and find that Defendants failed to follow FLPMA and NEPA requirements of public notice, opportunity for comment, and coordination with and meaningful involvement of State and local governments.

3.    Declare unlawful and set aside the DR because it unlawfully deprives the State and SITLA of access to State-owned Trust Lands administered by SITLA;

4.    Declare unlawful and  set aside BLM's DR as contrary to law, without lawful authority, and arbitrary and capricious.

5.    Declare unlawful and set aside BLM's DR as a violation of the RMP.

6.    Declare unlawful and set aside BLM's DR because Defendants failed to follow

and violated FLPMA's mandate to manage the public lands of the San Rafael Desert TMA in accordance with principles of multiple use and sustained yield.

      7.      Declare unlawful and set aside BLM's DR as a violation of the Dingell Act.

      8.      Declare unlawful and set aside BLM's DR because BLM violated FLPMA by closing public motorized access to roads to which State and County hold vested title preserved by FLPMA.

      9.      Declare unlawful and set aside BLM's DR because BLM violated NEPA's "hard look" standard by failing to consider how its road closures would impact the vested rights of the State and County.

      10.      Declare unconstitutional and unlawful and set aside BLM's DR because the closure of roads that are subject to R.S. 2477 rights of way held by the State and Emery County constitutes a taking of property, in violation of the Fifth Amendment to the United States Constitution.

Respectfully submitted this _____day of _____ 2024.

UTAH ATTORNEY GENERAL'S OFFICE

/s/ Roger R. Fairbanks
Kathy A.F. Davis
Roger R. Fairbanks
Assistant Attorneys General