KATHY A.F. DAVIS (4022)
ROGER R. FAIRBANKS (3792)
K. TESS DAVIS (15831)
Assistant Attorneys General
Utah Attorney General's Office
MARK BOSHELL (16002)
KENDALL G. LAWS (14700)
Special Assistant Attorneys General
DEREK E. BROWN (10476)
UTAH ATTORNEY GENERAL
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
kathydavis@agutah.gov
rfairbanks@agutah.gov
kaitlindavis@agutah.gov
mboshell@utah.gov
klaws@utah.gov

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH, including the UTAH SCHOOL AND INSTITUTIONAL TRUST LANDS ADMINISTRATION (SITLA), an agency of the State of Utah; and EMERY COUNTY, a Utah political subdivision,<br><br>    Plaintiffs,<br><br>vs.<br><br>DEB HAALAND, in her official capacity as SECRETARY OF THE INTERIOR; the DEPARTMENT OF THE INTERIOR, an agency of the United States of America; TRACY STONE-MANNING, in her official capacity as DIRECTOR OF THE BUREAU OF LAND MANAGEMENT; and the BUREAU OF LAND MANAGEMENT, an agency of the United States of America,<br><br>    Defendants, | Case No. 2:24-cv-00172<br><br><br>**OPENING BRIEF OF PLAINTIFFS**<br><br><br>Judge Ted Stewart<br>Magistrate Judge Daphne A. Oberg |

# Table of Contents

TABLE OF AUTHORITIES ...................................................................................... vi

INTRODUCTION AND BACKGROUND ................................................................ 1

STATEMENT OF ISSUES ........................................................................................ 3

SUMMARY OF THE ARGUMENT ......................................................................... 4

I.  The BLM acted arbitrarily and capriciously in violation of the Utah Enabling Act and established federal case law by eliminating and prohibitively restricting access to six sections of Trust Lands located within the TMA.

II.  The BLM acted arbitrarily and capriciously in violation of the Dingell Act by closing route number SD598, which was designated as and open "State Route" under the Act. ............. 5

III.  The BLM acted arbitrarily and capriciously in violation of the APA in deciding which roads to close and which roads to keep open and closing 195 miles of roads. ............................. 6

IV.  The BLM violated FLPMA and the APA by failing to comply with the Multiple Use and Sustained Yield Mandate of FLPMA. ...................................................................................... 6

V.  The BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands. . 7

VI.  The BLM violated FLPMA and its implementing regulations by failing to produce a TMP consistent with Utah Land Management Plans and failing to comply with requirements for public comment and coordination with state and local governments. ..................................... 8

VII.  The BLM violated the Settlement Agreement and NEPA by failing to comply with and substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R.

8342.2(a)...................................................................................................................... 9

VIII.    The BLM Violated FLPMA, NEPA and the Fifth Amendment to the Constitution of the United States by unlawfully closing roads to which the State of Utah and Emery County hold vested R.S. 2477 rights-of-way and by failing to even consider such rights-of-way. ............... 10

STATEMENT ON STANDING....................................................................................... 11

LEGAL FRAMEWORK ................................................................................................. 12

I.    The Utah Enabling Act........................................................................................ 12

II.    R.S. 2477 .......................................................................................................... 13

III.    The Wilderness Act ........................................................................................... 14

IV.    The Federal Land Policy and Management Act ..................................................... 15

   A. Inventory and Land Use Plans........................................................................ 15

   B. Consistency with State and Local Land Use Plans .......................................... 16

   C. Multiple Use and Sustained Yield .................................................................. 17

   D. Wilderness Study Areas ................................................................................ 17

   E. Areas of Critical Environmental Concern ........................................................ 18

   F. Rules and Regulations ................................................................................... 19

V. Administrative Procedures Act............................................................................. 19

   A. Rulemaking.................................................................................................. 20

   B. Judicial Review ............................................................................................ 20

FACTUAL BACKGROUND ........................................................................................... 21

I.    Arbitrary and capricious action in violation of the APA .......................................... 22

II.    Eliminated and diminished access to SITLA Lands ............................................ 24

III.    Violation of the Dingell Act ......................................................................... 25

IV.    Violation of FLPMA's multiple use and sustained yield mandate ................................... 26

V. Inconsistency with State and local government plans ................................................ 27

VI.    Violation of the Settlement Agreement with SUWA ............................................ 29

VII. Violation of vested RS2477 rights-of-way and the Fifth Amendment ................................ 29

STANDARD OF REVIEW ................................................................................... 33

ARGUMENT ................................................................................................ 34

I.    BLM's Elimination And Restriction Of Access To SITLA Parcels Violate Utah's Right To Access Trust Lands Under The Utah Enabling Act And Federal Case Law ......................... 35

II.    The BLM acted in violation of the Dingell Act by closing route number SD598, which was designated as and open "State Route" under the Act. ............................................. 37

III.    The BLM acted arbitrarily and capriciously in violation of the APA in deciding which roads to close and which roads to keep open and closing 195 miles of roads. ............................ 39

IV.    BLM'S DR Violates The "Multiple Use And Sustained Yield" Mandate Of FLPMA 4141

V.    The BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands.42

VI.    The BLM violated FLPMA and its implementing regulations by failing to produce a TMP consistent with Utah Land Management Plans and failing to comply with requirements

for public comment and coordination with state and local governments ....................................43

VII.    The BLM violated the Settlement Agreement and NEPA by failing to comply with and substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a)................................................................................................................................44

VIII.    The BLM Violated FLPMA, NEPA and the Fifth Amendment to the Constitution of the United States by unlawfully closing roads to which the State of Utah and Emery County hold vested R.S. 2477 rights-of-way and by failing to even consider such rights-of-way. ................46

CONCLUSION AND REQUEST FOR RELIEF........................................................................ 49

# TABLE OF AUTHORITIES

## Cases

*Block v. North Dakota ex rel. Bd. Of University and School Lands*, 461 U.S. 273 (1983) ........................ 32

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 at (2013) ............................................................ 11

*Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) ................................ 34

*Emery Cnty, Utah v. United States of America,* Case No. 2:12-cv-00429-CW (D. Utah 2012)................ 48

*Kane Cnty v. U.S.*, 2:10-cv-01073-CW .................................................................... 30, 47

*Kane Cnty., Utah v. Salazar*, 562 F.3d 1077, 1090 (10th Cir. 2009) ................................... 30, 33

*Lucas v. South Carolina Coastal* ......................................................................... 36

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) ........................................... 11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) .................... passim

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994)............................... 34

*Rocky Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992)...................... 20

*Sierra Club v. Hodel*, 675 F. Supp. 594, 605 (D. Utah 1987).................................................. 46

*SUWA v. BLM*, 425 F.3d 735 (10th Cir. 2005) ................................................. 13, 30, 32, 46

*SUWA et. al. v. BLM*, 2:21-cv-00091-DAK (D. Utah 2021)................................... 2, 9, 29, 44

*State of Utah v. Andrus*, 486 F. Supp. 995, 1001 (D. Utah 1979).................................... 4, 35

*Utah v. Kleppe*, 586 F.2d 756, 758 (10th Cir. 1978)................................................. 35

*Western Watersheds Project v. BLM*, 721 F.3d 1264, 1268 (10th Cir. 2013)............................. 41

## State Statutes

UTAH CODE ANN. §§ 72-5-302........................................................................ 48

UTAH CONST. Art. XX. ........................................................................... 24, 36

Utah Enabling Act................................................................................ passim

## Statutes

16 U.S.C. § 1131 ................................................................................................................ 14

30 U.S.C. §§20 ............................................................................................................... 7, 42

36 Fed. Reg. 8336 ............................................................................................................ 19

40 C.F.R. 1501 ................................................................................................................. 28

40 CFR § 1502 ............................................................................................................ 17, 27

43 C.F.R. § 1610 ............................................................................................................ 9, 44

43 C.F.R. § 8342 ........................................................................................................ passim

43 C.F.R. § 8340 ........................................................................................................ passim

43 U.S.C. § 1701 ....................................................................................................... passim

43 U.S.C. § 1702 .............................................................................................................. 18

43 U.S.C. § 1712 ....................................................................................................... passim

43 U.S.C. § 1732 ...................................................................................................... 6, 17, 41

43 U.S.C. § 1740 .............................................................................................................. 19

43 U.S.C. § 932 ................................................................................................................ 13

43 U.S.C. §315 .............................................................................................................. 7, 42

43 U.S.C. §1782 ............................................................................................................. 8, 43

5 U.S.C. § 553 .................................................................................................................. 20

5 U.S.C. § 702 .................................................................................................................. 33

5 U.S.C. § 706 .......................................................................................................... passim

5 U.S.C. §§ 500-596 ......................................................................................................... 19

APA ............................................................................................................................ passim

Fifth Amendment ...................................................................................................... passim

John D. Dingell, Jr. Conservation, Management, and Recreation Act ....................... passim

NEPA .......................................................................................................................... passim

Quiet Title Act .......................................................................................................... passim

Taylor Grazing Act ................................................................................................................ 7, 42

United States Constitution, Article IV, Section 3 cl. 2 ........................................................ 7, 42

Wilderness Act .................................................................................................................... 14, 17

## INTRODUCTION AND BACKGROUND

Plaintiffs, State of Utah ("the State" or "Utah"), including the Utah School and Institutional Trust Lands Administration ("SITLA") and Emery County ("County"), challenge and seek to have this court declare invalid and set aside the BLM's October 28, 2022, Decision Record on the San Rafael Desert Travel Management Plan: Reconsideration of Routes as Required by the 2022 Settlement Agreement (DOI-BLM-UT-G020-2018-0004-EA) ("DR"). The San Rafael Desert Travel Management Area ("TMA") encompasses roughly 377,609 acres of lands managed by the Bureau of Land Management ("BLM") in southeastern Emery County, Utah. Dkt. 35, First Am. Compl. at ¶¶1-2.

The DR – a "Reconsideration of Routes," as the BLM characterized it – resulted in the closure of approximately 195 miles of roads and road segments that were previously designated as open in the original San Rafael Desert Travel Management Plan (Original TMP), adopted two years earlier on August 21, 2020. The BLM Map which depicts in red the routes and route segments closed by the October 28, 2022 Decision Record can be accessed at:

https://eplanning.blm.gov/EPLCommentMap/?itemId=2d960e575aa3498d8c16f482f4a93c68

*Id*. at ¶ 2.

The closure of these roads impairs the value of the San Rafael Desert Area and negatively affects various interests of the Plaintiffs.

An understanding of the facts and circumstances that led to BLM's DR is important. Two years earlier, on August 21, 2020, the BLM issued its original DR and Finding of No Significant Impact (FONSI) for the Original San Rafael Desert TMP (DOI-BLM-UT-G020-2018-0004-EA). Plaintiffs did not challenge the original TMP and contend that it should remain in effect without the modifications of the 2022 DR. This original DR was challenged by the Southern Utah

Wilderness Alliance and the Wilderness Society (collectively "SUWA"), first at the Interior Board of Land Appeals ("IBLA") and later by filing a complaint for declaratory and injunctive relief in the United States District Court for the District of Utah. *SUWA et. al. v. BLM*, 2:21-cv-00091-DAK (D. Utah 2021). *Id.* at ¶¶ 4-8. Plaintiffs were granted intervention in the proceedings before the IBLA and the District Court case. *Id.*

SUWA sought to force the BLM to reconsider and close additional routes that are within an area it calls "Red Rock Wilderness." Every year for the past twenty-five years, SUWA and a few members of Congress sponsor a bill called the Red Rock Wilderness Bill, aimed at creating millions of additional acres of congressionally designated wilderness throughout Utah. The bill has never succeeded. The approximately 195 miles of routes and route segments that were closed by BLM's DR are within the area SUWA considers to be Red Rock Wilderness. Id. at ¶¶ 5-10.

SUWA and the BLM negotiated a settlement ("Settlement Agreement") of the case in U.S. District Court without any inclusion or involvement of the State and other intervenors, and the court dismissed the case. *SUWA et. al. v. BLM*, Dkt. 60. Pursuant to the Settlement Agreement, BLM reconsidered for closure the approximately 195 miles of roads in the original TMP that were previously designated as open. *Id.*, Dkt. 52.

BLM held a meeting with the State, SITLA and Emery County, all Cooperating Agencies, on July 7, 2022, to unveil its Preliminary Reconsideration Decision. At that meeting, maps were shown but not disseminated and it was apparent that BLM was not interested in hearing concerns or comments from the State, SITLA, or Emery County prior to the public comment period. The State of Utah and Emery County submitted their comment letters on August 26, 2022. On October 28, 2022, BLM published its DR that not only fully incorporated the entirety of the Preliminary Reconsideration Decision but closed an additional three roads

(SD308, SD312, and SD333) that the State, Emery County and SITLA were told would be left open. Dkt. 35, First Am. Compl. at ¶¶ 12-15.

SITLA also submitted relevant comments during each of the respective comment periods. Despite Plaintiffs' detailed comments, BLM did not make a single change to its Preliminary Reconsideration Decision. *Id.* ¶ 17.

## STATEMENT OF ISSUES

1.     Whether the BLM violated the Utah Enabling Act and federal case law by eliminating and prohibitively limiting access to six sections of Trust Lands located within the San Rafael Desert TMA.

2.     Whether the BLM acted arbitrarily and capriciously in violation of the Dingell Act by closing route number SD598, which was designated as an open "State Route" under the Act and by failing to consider and facilitate the expansion of hunting, fishing, and recreational shooting.

3.     Whether the BLM acted arbitrarily and capriciously in violation of the APA in deciding which roads to close and which roads to keep open and closing 195 miles of roads.

4.     Whether the BLM violated FLPMA and the APA by failing to comply with the Multiple Use and Sustained Yield Mandate of FLPMA.

5.     Whether the BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands.

6.     Whether the BLM violated FLPMA and implementing regulations by failing to comply with requirements for public comment and coordination with State and local governments and provide and render a TMP consistent with Utah Land Management Plans.

7.     Whether the  BLM violated the Settlement Agreement and NEPA by failing to comply with and substantiate its compliance with the requirements of 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a).

8.     Whether the BLM violated FLPMA and NEPA by failing to consider rights-of-way for which the State and County hold vested title interests and by closing public motorized access to roads subject to those rights-of-way.

9.     Whether the BLM violated the Fifth Amendment to the Constitution of the United States by unlawfully taking property of the State and County.

## SUMMARY OF THE ARGUMENT

Plaintiffs challenge BLM's DR for the San Rafael Desert TMP as unlawful for the reasons described below and request that the Court declare the DR unlawful and set it aside.

**I.     The BLM acted arbitrarily and capriciously in violation of the Utah Enabling Act and established federal case law by eliminating and prohibitively restricting access to six sections of Trust Lands located within the TMA.**

The State of Utah holds fee title to over 70 sections of land within the San Rafael Desert TMA that are administered and managed by SITLA, in trust, for the benefit of the public-school systems in the state ("Trust Lands"). The Trust Lands were originally granted to the State to be used for this purpose in the Utah Enabling Act, ch. 138, 28 Stat. 107 (1894). This Court held in *State of Utah v. Andrus,* 486 F. Supp. 995 (D. Utah 1979), that "the state must be allowed access [to Trust Lands] which is not so narrowly restrictive as to render the lands incapable of their full economic development" and that "the terms of FLPMA itself would indicate that Congress did not intend to amend rights under the school land grant program." *Id.* at 1009-1010. The case is commonly referred to as the *Cotter* decision.

The BLM's DR eliminated and prohibitively restricted access to six sections of Trust Lands. The elimination and prohibitive restriction of access renders the affected lands incapable of their full economic development and compromises the rights granted to the State under the school land grant program, in violation of the Utah Enabling Act and established federal case law.

**II.    The BLM acted arbitrarily and capriciously in violation of the Dingell Act by closing route number SD598, which was designated as an open "State Route" under the Act, and by failing to consider and facilitate the expansion of hunting, fishing, and recreational shooting.**

On March 12, 2019, the United States Congress passed Public Law 116-9, otherwise known as the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"). John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pl 116-9, March 12, 2019, 133 Stat 580. The Dingell Act designated 18 wilderness areas in Emery County, including the Labyrinth Canyon Wilderness located within the San Rafael Desert Travel Management Area. *Id*. at Section 1231, 133 Stat. 71. As part of the process, an Overview Map dated February 5, 2019, was created, and memorializes route number SD598 as an open "State Route." *Id*. at 133 Stat 667.

The BLM's DR closed this congressionally designated open route. The closure, regardless of the condition or use of the road, is contrary to expressed congressional intent, an illegal overreach, a violation of federal law and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706. BLM cannot administratively override congressional action. The Dingell Act also mandates that federal departments and agencies shall facilitate the expansion of and consider hunting, fishing, and recreational shooting opportunities as part of all

federal plans for land, resource, and travel management.  Dingell Act, at Section 4001, 133 Stat. 756. There is no indication anywhere in the Administrative Record that BLM complied with this mandate.

## III.    The BLM acted arbitrarily and capriciously in violation of the APA in deciding which roads to close and which roads to keep open, and by closing 195 miles of roads.

The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

A thorough analysis of the specific facts underlying BLM's decision, set forth more fully below, reveals that the BLM acted arbitrarily and capriciously in deciding which roads to close and which roads to keep open.

BLM improperly reversed its previous NEPA process. The same NEPA process that supported keeping routes open in 2020, now, without any articulated changes to the Administrative Record, supports the 2022 full closure of 195 miles of previously open routes. Absent justification within the Administrative Record, the decision is arbitrary and capricious, as well as illegal and *ultra vires*.

## IV.    The BLM violated FLPMA and the APA by failing to comply with the Multiple Use and Sustained Yield Mandate of FLPMA.

Under FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a). This means that

RMPs must account for various resources, including "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values" while striving for "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. at § 1702(c), (h).

BLM's DR closed roads based upon a rationale that only considers conservation (which is, by definition, a non-use) and fails to consider livestock grazing, wildlife management, motorized recreation, travel, and other activities that fall under the "multiple use" framework. Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands," among other benefits. 43 C.F.R. § 8342.1. BLM's DR violates FLPMA by failing to manage the public lands of the San Rafael Desert TMA in accordance with principles of multiple use and sustained yield and is arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706.

V.    **The BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands.**

Constitutional authority to classify and manage public lands resides with Congress. United States Constitution, Article IV, Section 3 cl. 2. In various federal laws, including but not limited to the Taylor Grazing Act ("TGA"), 43 U.S.C. §§315-315q, FLPMA, 43 U.S.C. §§1701 *et seq.*, the 1872 Mining Law, as amended, 30 U.S.C. §§20, *et seq.*, and the Mineral Leasing Laws ("MLA"), 30 U.S.C. §§181, *et seq.*, Congress has delegated its constitutional authority to the federal Defendants to manage public lands. This delegated authority is defined and limited by the terms of the respective federal statutes.

Even though the DR does not use the term "wilderness" to describe its management of the San Rafael Desert TMA, the practical effect of the BLM's decision to close 195 miles of roads in the DR was to create WSA-type management. BLM's wilderness review authority under §603 of FLPMA, 43 U.S.C. §1782(c), has terminated, and as a result, BLM must "not manage or otherwise treat public lands, other than §603 WSAs. . . as WSAs or as wilderness pursuant to the [FLPMA] §202 process." The BLM's DR unlawfully treats the non-WSA lands of the San Rafael Desert TMA as *de facto* WSA lands.

**VI.    The BLM violated FLPMA and its implementing regulations by failing to produce a TMP consistent with Utah Resource Management Plans and failing to comply with requirements for public comment and coordination with state and local governments.**

Under FLPMA and NEPA, the DOI and BLM must "allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands." DOI and BLM must also coordinate with and provide for meaningful involvement of state and local governments "in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands." 43 U.S.C. §1712(c)(9).

BLM regulations implementing FLPMA are in accord. "The public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance and be given early notice of planning activities." 43 C.F.R. §1610.2.

BLM did not comply with regulations requiring them to provide meaningful notice and comment periods.  Nor did they coordinate with state and local governments before announcing and implementing the DR challenged by this action.

Additionally, BLM's TMP and DR are not consistent with the State's duly adopted Resource Management Plan. FLPMA requires that BLM land use plans be "consistent with State and local plans to the maximum extent [the Secretary of Interior] finds consistent with Federal law and the purposes of [FLPMA]." 43 U.S.C. § 1712(c)(9). Regulations implementing FLPMA require the BLM to provide state governors with the opportunity to submit a "Governor's Consistency Review" of a BLM land use plan, and further require the BLM to consider and analyze the Governor's recommendations. 43 C.F.R. § 1610.3-2(e).

The BLM denies that travel management plans are "land use plans" under FLPMA, and claims that the FLPMA requirements of 43 U.S.C. § 1712(c)(9) or the regulatory requirements of 43 C.F.R. § 1610.3-2(e) do not apply to travel management plans. The BLM has not justified its reasoning that travel management plans are merely "implementation level decisions" that do not fall under the auspices of FLPMA land use plans. The BLM has therefore violated FLPMA and its implementing regulations by not seeking consistency between its DR and the State Resource Management Plan, and by failing to provide the Governor of Utah with the formal opportunity to submit a Governor's Consistency Review of the DR.

**VII.    The BLM violated the Settlement Agreement and NEPA by failing to comply with and substantiate its compliance with the requirements of 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a).**

The DR was the direct result of a Settlement Agreement reached in the case of *Southern Utah Wilderness Alliance v. U.S. Bureau of Land Management, et. al.*, Case No. 2:21-cv-0091-

DAK-JCB. Paragraph two of the Settlement Agreement requires that the BLM comply with applicable law, including OHV regulations at 43 C.F.R. Part 8340 and NEPA. Paragraph five of the Settlement Agreement requires that the BLM consult with interested user groups, federal, state, county and local agencies, local landowners, and other parties in a manner that provides an opportunity for the public to express itself and have its views given consideration, in accordance with 43 C.F.R. 8342.2(a).

The BLM violated the TMP Settlement Agreement and NEPA by failing to substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a). The OHV regulations are merely mentioned in passing in the DR, with no showing of compliance.

**VIII.  The BLM violated FLPMA, NEPA and the Fifth Amendment to the Constitution of the United States by unlawfully closing roads to which the State of Utah and Emery County hold vested R.S. 2477 rights-of-way and by failing to even consider such rights-of-way.**

The R.S. 2477 statute provided for the construction of public highways across unreserved federal public land. Upon fulfilling the public highway requirements of R.S. 2477, State and County governments became the "holders" of rights-of-way to those highways. Rights-of-way granted under R.S. 2477 were self-executing, requiring no action on the part of the federal government.

Although FLPMA repealed R.S. 2477 upon its passage in 1976, FLPMA preserved any valid lease, permit, patent, right-of-way, or other land use right or authorization existing upon the passage of FLPMA.

The BLM's DR closes public motorized access on 195 miles of roads to which the State and County are the "holders" of pre-1976 vested rights-of-way. This closure disturbs the State's

and County's use of those vested rights-of-way. Even though the State's and County's vested title in the rights-of-way within the TMA are not yet perfected and are in one instance still the subject of a pending legal action under the Quiet Title Act, the State and County are nevertheless holders of the rights-of-way within the TMA. BLM has therefore violated FLPMA.

NEPA requires federal agencies such as the BLM to take a "hard look" at the environmental consequences of a federal action warranting NEPA analysis. During the development of the EA for the BLM's TMP, the State and County asked the BLM to consider the impacts of road closures on their vested rights under R.S. 2477. Despite these requests, the BLM declined to even consider these impacts. The BLM's failure to consider how its road closures would impact the vested rights of the State and County violates NEPA's "hard look" standard.

The DR's closure of 195 miles of roads that are subject to R.S. 2477 rights-of-way held by the State and Emery County, and that have the status of vested real property rights, also constitutes a taking of property in violation of the Fifth Amendment to the United States Constitution.

## STATEMENT ON STANDING

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 at (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). As a direct result of the BLM's DR, the State, SITLA and Emery County will suffer a variety of concrete, particularized, and actual or imminent injuries that are directly attributable to the DR. All of these injuries would be adequately redressed by this Court declaring and setting aside the DR as unlawful.

The State has suffered or will imminently suffer the following injuries. First, the DR closed roads that provided access to six sections of State-owned Trust Lands administered by SITLA. Dkt. 35, First Am. Compl. at ¶¶ 36-46. This will result in a significant loss of revenue for the State's public schools resulting from devaluation of the property. *See id*. Second, the DR strips the State of regulatory authority over all motorized travel within its borders and impairs the State's vested right-of-way ownership interest in approximately 195 miles of roads. *Id.* at ¶¶ 49-51. Third, the DR impairs the State's interest in the economic benefits of motorized recreation, as well as the associated tax revenue.[1] *Id.* at ¶¶ 52-56. Fourth, the DR impairs the State's interest in livestock grazing and agriculture, including grazing, in the San Rafael Desert TMA. *Id.* at ¶¶ 56-72. Fifth, the DR impairs the State's ability to manage the wildlife within its borders. *Id.* at ¶¶ 73-75. This impacts both the State's property interest in wildlife and the State's economic interest in the sale of hunting and fishing licenses. *Id.*

## LEGAL FRAMEWORK

### I.     The Utah Enabling Act

The Utah Enabling Act granted to the State sections two, sixteen, thirty-two, and thirty-six of every township within the State for the express purpose of supporting the State's public school systems. Utah Enabling Act, Sec. 6. In the *Cotter* decision, 486 F. Supp. at 1001, this Court explained:

> [T]he state school land grants were not unilateral gifts made by the United States Congress. Rather, they were in the nature of a bilateral contract entered into between two sovereigns. In return for receiving the federal lands Utah disclaimed all interest in the remainder of the public domain, agreed to forever hold federal lands immune from taxation, and agreed to hold the granted lands, or the proceeds therefrom, in trust as a common school fund.

---

[1] The Utah Division of Outdoor Recreation recently released 2023 data valuing the economic impact of ATVing at $166M and RVing at $412M. *See* https://naturalresources.utah.gov/dnr-newsfeed/utahs-outdoor-recreation-economy-breaks-records-reaching-9-5-billion/.

Two of the findings in the *Cotter* decision are pertinent here. First, the Court found that, "Unless a right of access is inferred, the very purpose of the school trust lands would fail." *Id.* at 1002. Furthermore, because school trust grants are subject to liberal rules of statutory construction, the Court applied the common law assumption "that a grantor intended to include in the conveyance whatever was necessary for the use and enjoyment of the land in question." *Id.* Second, the Court found that "the school land grants were accomplished under what is termed 'special' legislation." *Id.* at 1009. "Special acts" supersede general acts that deal with the same subject matter, unless there is some indication that Congress intended to modify the special act. *Id.* "There is, however, no such indication in the legislative history of FLPMA. Indeed, the terms of FLPMA itself would indicate that Congress did not intend to amend rights under the school land grant program." *Id.* at 1010. The Court summarized its findings with the following:

> Thus, the court finds that 1) BLM can regulate the method and route of access to state school trust lands; 2) this regulation may be done with a view toward preventing impairment of wilderness characteristics (assuming no existing use); 3) the regulation may not, however, prevent the state or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *Id.*

## II.    R.S. 2477

R.S. 2477 provides as follows: "And be it further enacted, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy Management Act of 1976 (FLPMA), Pub. L. No. 94-579 § 706(a), 90 Stat. 2743. R.S. 2477 was an open congressional grant *in praesenti* of public highway rights-of-way for the benefit of miners, ranchers, homesteaders, and all other members of the public who had a need to travel across public lands. *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425

13

F.3d 735, 741 (10th Cir. 2005) (hereinafter "*SUWA v. BLM*"). R.S. 2477 operated as a standing offer of a right-of-way over the public domain, and the grant may be accepted without formal action by public authorities. *Id*.

R.S. 2477 was repealed on October 21, 1976, by FLPMA, 43 U.S.C. § 1701 *et. seq*. In repealing R.S. 2477, Congress preserved vested R.S. 2477 rights-of-way as valid existing rights and expressly directed the United States and its subordinate agencies (including the DOI and the BLM) to manage federal lands subject to these valid existing rights. Section 701(h) of FLPMA provides as follows: "All actions by the Secretary concerned under this Act shall be subject to valid existing rights." *Id*. § 1701, note; see also § 1769(a) ("Nothing in this subchapter shall have the effect of terminating any right-of-way or right of use heretofore issued, granted or permitted.").

### III.     The Wilderness Act

The Wilderness Act of 1964 was enacted "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). Management of these wilderness areas was to be done in "such manner as will leave them unimpaired for future use and enjoyment as wilderness." *Id*. The Wilderness Act process for adding lands to the National Wilderness Preservation System ("NWPS") begins with recommendations to the President from the secretaries of either the Department of Agriculture or DOI. *Id*. § 1132(a)-(c). The President then makes a recommendation to Congress, which reserved to itself the power to designate wilderness. *Id*. Specifically, the Wilderness Act states that "no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent Act." *Id*. § 1131(a).

The Act defines wilderness as "an area where the earth and its community of life are

untrammeled by man, where man himself is a visitor who does not remain" and "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvement or human habitation." *Id.* § 1131(c). A qualifying area is defined as an area that:

> (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, education, scenic, or historical value. *Id.*

## IV.    The Federal Land Policy and Management Act

Congress enacted FLPMA, 43 U.S.C. § 1701–1787, to establish uniform and coherent administration of public lands. This Congressional mechanism includes (1) the creation of resource inventories and land use plans; (2) implementation of "multiple use" management plans; (3) management of lands recommended for inclusion in the NWPS as Wilderness Study Areas ("WSAs"); and (4) designation and management of Areas of Critical Environmental Concern ("ACECs") according to land use plans. *Id.*

### A. Inventory and Land Use Plans

Section 201 of FLPMA requires the Secretary of the Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). This inventory is to be kept current in order to reflect any changed conditions and to "identify new and emerging resource and other values." *Id.* In addition to the requirement to prepare an inventory, FLPMA requires that "[t]he preparation and maintenance of [the] inventory or the identification of such areas shall not, of itself, change or prevent change of management or use of public lands." *Id.*

Section 202 of FLPMA requires the Secretary of the Interior, with public participation, to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id*. at § 1712(a). In developing these land use plans, currently known as Resource Management Plans (or RMPs), the BLM must rely "on the inventory of the public lands, their resources, and other values." *Id*. at § 1712(c)(4). FLPMA also requires the Secretary of the Interior to "coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of . . . the State and local governments within which the lands are located[.]" *Id*. at § 1712(c)(9). Moreover, the Secretary of the Interior

> shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary [of the Interior] with respect to the development and revision of land use plans [and] land use guidelines … for the public lands within such State and with respect to such other land use matters as may be referred to [the Secretary of the Interior] by them. *Id*.

### B. Consistency with State and Local Land Use Plans

Under FLPMA, when developing or creating Resource Management Plans, the BLM is required to coordinate its land use inventory, planning, and management activities for such lands with the land use planning and management programs of the states within which the lands are located. 43 U.S.C.A. § 1712(c)(9). The BLM also is required in the development of land use plans to ensure that consideration is given to the applicable state, local, and tribal plans "and to resolve, to the extent practical, inconsistencies between Federal and non-Federal Government plans." *Id.* FLPMA further mandates that BLM land use plans "shall be consistent with state and local plans to the maximum extent [the Agency] finds consistent with federal law and the purposes of this Act." *Id.* In addition to the coordination and consistency requirements, CEQ

regulations require federal agencies to discuss the conflicts between the proposed action and the objectives of state and local plans. *See* 40 CFR § 1502.16.

### C. Multiple Use and Sustained Yield

As set forth in FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a). "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id*. § 1702(c). These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

"Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. § 1702(h). As set forth in FLPMA, the "principal or major uses" of public lands include and *are* limited to "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." *Id*. § 1702(l).

### D. Wilderness Study Areas

Wilderness Study Areas, or WSAs, are those lands inventoried and identified by BLM as suitable for preservation as wilderness, subject to prior existing rights and uses. 43 U.S.C. § 1782(c). Because the Wilderness Act does not directly address BLM's authority to designate or manage public lands as wilderness, FLPMA section 603 provides for a two-step inventory and management process.

First, within fifteen years of the October 21, 1976 passage of FLPMA, the Secretary of

the Interior was directed to use the Section 201 Inventory to identify potential wilderness areas and "from time to time [within that fifteen-year period] report to the President his recommendation as to the suitability or nonsuitability of each area or island for preservation as wilderness." *Id*. at § 1782(a). Second, the President was to advise Congress within two years of each report by the Secretary of the Interior of "his recommendations with respect to designation as wilderness of each such area", with the President's recommendations for wilderness designations becoming effective only if so provided by an act of Congress. *Id*. at § 1782(b). On October 21, 1991, BLM's authority to review, recommend, create, or manage lands as WSAs terminated. *Id*. at § 1782(a).

Only Congress has the discretion to either designate WSA lands as part of the NWPS or to release them for other uses. *Id*. § 1782(b). Prior to congressional determination, management of recommended WSAs must be done in "a manner so as not to impair the suitability of such areas for preservation as wilderness," subject to prior existing rights and uses (the non-impairment standard). *Id*. § 1782(c). The BLM's Interim Management Policy for Lands Under Wilderness Review ("IMP") was to provide management guidance to BLM staff for section 603 WSAs pending congressional action. Pursuant to FLPMA section 302(b), BLM is to manage all other lands to the lesser "undue degradation" standard.

### E. Areas of Critical Environmental Concern

FLPMA defines Areas of Critical Environmental Concern ("ACECs") as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a). Under

FLPMA Section 201, the Secretary of the Interior must give priority to ACECs in the inventory of public lands. *Id*. at § 1711(a). Under FLPMA Section 202, the designation and protection of ACECs are given priority in the development and revision of land use plans. *Id*. at § 1712(c)(3). Prior to designating an ACEC, the BLM State Director must provide a 60-day period for public comment on the proposed designation. 43 CFR § 1610.7-2(b).

### F. Rules and Regulations

To carry out the purposes of FLPMA, the Secretary of the Interior is required to promulgate rules and regulations. "The promulgation of such rules and regulations shall be governed by the provisions of chapter 5, title 5," the Administrative Procedures Act, 5 U.S.C. §§ 500-596. 43 U.S.C. § 1740. In 1971, DOI promulgated a rule to follow rulemaking procedures, even if the subject matter would fall within APA exceptions to rulemaking procedures. 36 Fed. Reg. 8336 (May 4, 1971).

### V. Administrative Procedures Act.

Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations. The APA also establishes a process for judicial review of agency decisions. The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. § 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

## A. Rulemaking

Rulemaking procedures are clearly laid out in the APA and require both notice and the opportunity to comment. 5 U.S.C. § 553. Notice of proposed rulemaking is to be published in the Federal Register and must include "(1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id*. at § 553(b). After providing notice, an agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. at § 553(c).

Except as otherwise required by statute, the APA provides an exception to the notice and comment requirements for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id*. at § 553(b)(3)(A). Courts will overturn a rule purporting to exist under this exception if it was promulgated pursuant to a direct delegation of legislative power by Congress or "if it changes existing law, policy or practice." *Rocky Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992).

## B. Judicial Review

The APA also establishes a procedure for judicial review for those who are suffering a legal wrong as the result of a final agency action and have no other adequate remedy. *Id*. at § 704. The reviewing court may decide "all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id*. at § 706. The court shall, among other things, "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right . . . [or] without observance of procedure required by law." *Id*. at § 706(2)(A) and (C)-(D).

## FACTUAL BACKGROUND

The San Rafael Desert Travel Management Area ("TMA") encompasses roughly 377,609 acres of lands managed by the Bureau of Land Management ("BLM") in southeastern Emery County, Utah. BLM's DR – a "Reconsideration of Routes," as the BLM characterized it – resulted in the closure of approximately 195 miles of roads and road segments that were previously designated as open in the original San Rafael Desert TMP ("Original TMP"), which was adopted two years earlier by the BLM on August 21, 2020. DOI-BLM-UT-G020-2018-0004-EA. The BLM maps depict in red the routes and route segments closed by the October 28, 2022 DR. AR at 6120-6127. Plaintiffs did not challenge the original TMP and contend that it should remain in effect without modification of the DR.

As set forth above, SUWA and TWS employed a "sue and settle" strategy by challenging the original TMP, seeking to close the additional 195 miles of roads, first at the IBLA and then in this Court. SUWA and the BLM negotiated a settlement without any inclusion or involvement of the State, County, or SITLA, and the Court dismissed the case. *See* RMP Settlement Agreement, *supra*, at 5. The BLM then did exactly what SUWA demanded, completely disregarding input from the State, SITLA, and Emery County. *Id*. at 6.

An analysis of the specific facts underlying BLM's decision reveals that the BLM acted arbitrarily and capriciously in deciding which roads to close and which roads to keep open in violation of the APA, the Utah Enabling Act and federal case law, the Dingell Act, FLPMA, NEPA, the Settlement Agreement with SUWA, R.S. 2477, and the Fifth Amendment to the Constitution.

I.    **Arbitrary and capricious action in violation of the APA**

The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. § 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

The Road identified by the BLM as SD520 was left open during BLM's reconsideration process but is in the same condition or even less traveled and defined than many of the routes considered "reclaimed or reclaiming" under the DR. Dkt. 35, First Am. Compl. Ex. 2.  The road is substantially similar to SD788, SD536, and SD516, all of which were initially open under the original TMP. These routes, like others, are listed as being appropriate for closure to minimize damage to resources in the area. They are in an area that is prominently black brush and blow sand, just like SD520; they are all typically one windy or rainy season away from having the track marks that reveal route usage reclaimed.

Nowhere does BLM reference any specific species or other resources that would be impacted if the roads were left open; there is nothing to significantly distinguish these routes from SD520, demonstrating the arbitrary and capricious nature of the decision-making process.

The road identified as SD685b was left open under the original 2020 TMP but is now designated as closed. The stated reason for closure of SD685b in the DR is to protect habitat for managed and special status species, wilderness character, and native pollinators; however, as shown in Exhibit 3 to the Amended Complaint, the route goes through a grove of invasive

tamarisks that should be managed under various federal laws rather than protected through route closures. Invasive species are not beneficial for managed or special status in this area, nor are they typically targets for native pollinators. *Id*., Ex. 3.

The road designated as SD1027, Segment 2, provides access to a scenic and unique area that overlooks the Green River. As shown in Exhibits 4a and 4b to the Amended Complaint, the road is far from reclaimed; it is actually in very good condition and provides access to remarkable views for a wide range of recreationalists, including basic four-wheel drive vehicles. *Id*., Ex. 4a and 4b. The rationale for closing road SD1027 is nearly identical to the rationale used for closing road SD1050. The difference is that road SD1050 does not actually exist on the ground, has been fully reclaimed, and not even a remnant or segment is visible. The fact that these two roads (SD1027 and SD 1050) are being closed under an identical rationale further demonstrates the arbitrary and capricious nature of BLM's decision-making process.

The road identified as SD1340, Segment 1, is being closed primarily because it is a redundant route; however, the important difference between this and other roads is that it provides a vastly different recreational experience to the roads it parallels. The road is visible and easily identifiable on the ground.  *Id*., Ex. 5. It provides a more rugged all terrain experience, whereas the parallel routes provide a much easier and novice-friendly experience.

Based on the inadequate record, the BLM's DR failed to adhere to the BLM's own rules and regulations. BLM improperly reversed its previous NEPA process. The same NEPA process that supported keeping routes open, without any articulated changes to the Administrative Record, now apparently supports the full closure of 195 miles of previously open routes.

Absent justification within the Administrative Record, the decision to close the approximately 195 miles of routes in the TMP that were previously designated as open is

arbitrary and capricious, as well as illegal and *ultra vires*.

## II.     Eliminated and diminished access to SITLA Lands

Pursuant to the Utah Constitution, the State of Utah owns all property interests acquired from the United States at or after the time of statehood. UTAH CONST. Art. XX. The State of Utah holds fee title to over 70 sections of Trust Lands within the San Rafael Desert TMA that are administered and managed by SITLA. Many of the roads within the TMA provide transportation and access to these Trust Lands and contribute to the financial viability of the public-school systems in the state.

The DR closes and eliminates motorized access to six sections of Trust Lands owned by the State of Utah and managed by SITLA. Those SITLA sections are located at (1) Township 25 South, Range15 East, Section 36; (2) Township 25 South, Range 15 East, Section 32; (3) Township 24 South, Range 16 East, Section 16; (4) Township 23 South Range 15 East, Section 32; (5) Township 24 South, Range 14 E, Section 2; and (6) Township 26 South Range 15 East, Section 32. AR at 6120-6127. Access to these parcels is eliminated by the DR's closure of twelve routes: (1) SD371_Seg 2, (2) SD525, (3) SD536, (4) SD720, (5) SD870, (6) SD869, (7) SD956, (8) SD952, (9) SD948a, (10) SD128, (11) SD319, and (12) SD320. *Id*.

The marketability and value of the affected Trust Lands will be significantly reduced, diminishing their per-acre value. The closure of access roads severely limits the potential uses of these Trust Lands and their accessibility, thereby reducing their attractiveness to potential buyers or lessees. Continued access to these Trust Lands is paramount for fulfilling the intent of the original land grant from the United States.

In addition to the valuation loss, SITLA has very limited budgets for road maintenance. *Id*. at ¶ 45. That is by design, to maximize disbursements of revenue. *Id*. Therefore, it is

imperative for the State, SITLA, and their Trust Lands beneficiaries that roads leading to SITLA Trust Lands be open to the public; this allows SITLA to partner with the Emery County Road Department and others to improve or maintain the roads when needed. *Id.*

### III.    Violation of the Dingell Act

On March 12, 2019, the United States Congress passed Public Law 116-9, otherwise known as the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"). John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pl 116-9, March 12, 2019, 133 Stat. 580. Among other things, the Dingell Act designated 18 wilderness areas in Emery County, including the Labyrinth Canyon Wilderness located within the San Rafael Desert Travel Management Area. *Id*. at Section 1231, 133 Stat. 71. As part of the process, an Overview Map dated February 5, 2019, was created, and memorializes route number SD598 as an open "State Route." *Id*. at 133 Stat. 667. The BLM's DR has now closed this congressionally designated open route. The closure, regardless of the condition or use of the route, is contrary to expressed congressional intent as reflected by the Overview Map designating the Labyrinth Canyon Wilderness. This is an illegal overreach; BLM cannot at the administrative level override congressional action.

The Dingell Act also states:

> SEC. 4001.  CONGRESSIONAL DECLARATION OF
>             NATIONAL POLICY.
>
>    (a) In General.--Congress declares that it is the policy of the
> United States that Federal departments and agencies, in accordance with
> the missions of the departments and agencies, Executive Orders 12962 and
> 13443 (60 Fed. Reg. 30769 (June 7, 1995); 72 Fed. Reg. 46537 (August 16,
> 2007)), and applicable law, shall--
>         (1) facilitate the expansion and enhancement of hunting,
>     fishing, and recreational shooting opportunities on Federal
>     land, in consultation with the Wildlife and Hunting Heritage
>     Conservation Council, the Sport Fishing and Boating Partnership

Council, State and Tribal fish and wildlife agencies, and the public;

   (2) conserve and enhance aquatic systems and the management of game species and the habitat of those species on Federal land, including through hunting and fishing, in a manner that respects--

      (A) State management authority over wildlife resources; and

      (B) private property rights; and

   (3) consider hunting, fishing, and recreational shooting opportunities as part of all Federal plans for land, resource, and travel management.

*Id.*, 133 Stat. 757. This language in the Dingell Act mandates that federal departments and agencies shall consider and facilitate the expansion of hunting, fishing and recreational shooting opportunities as part of all federal plans for land, resource and travel management. Dingell Act, at Section 4001, 133 Stat. 756. BLM failed to comply with this mandate; there is no indication anywhere in the Administrative Record that it did so.

### IV.    Violation of FLPMA's multiple use and sustained yield mandate

FLPMA requires the BLM to manage public lands according to multiple use and sustained yield principles, in order to "meet the present and future needs of the American people." *See* 43 U.S.C. 1701(a)(7), and 1702(c). These uses include domestic livestock grazing, which is defined as a "principal or major use." *Id.* at (1). Under FLPMA, lands within the TMA must be managed to protect rangeland improvements and promote domestic livestock grazing. *Id.* BLM's route closures considered only conservation and failed to take into account grazing, recreation, and other multiple uses. Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Transportation connectivity reduces in and out traffic and can help disperse use. Additionally, keeping roads open provides the traveling public access while reducing the need and desire to

26

pioneer new and unauthorized routes. The DR violates FLPMA by failing to manage the public

lands according to the standards set forth above.

### V. Inconsistency with State and local government plans

Under FLPMA, when developing or creating Resource Management Plans, the BLM is

required to coordinate state and local government plans. 43 U.S.C.A. § 1712. The BLM also is

required in the development of land use plans to ensure that consideration is given to the

applicable state, local, and tribal plans "and to resolve, to the extent practical, inconsistencies

between Federal and non-Federal Government plans." *Id.* FLPMA further mandates that BLM

land use plans "shall be consistent with state and local plans to the maximum extent [the

Agency] finds consistent with federal law and the purposes of this Act." *Id.* In addition to the

coordination and consistency requirements, CEQ regulations require federal agencies to discuss

the conflicts between the proposed action and the objectives of state and local plans. *See* 40 CFR

§ 1502.16.

The State of Utah and Emery County both have duly adopted resource management

plans. County Resource Management Plan ("CRMP"). Utah State Resource Management Plan,

("Utah SRMP"), Introduction, *available at:*

https://storymaps.arcgis.com/collections/81d4406668e34acca4d98275ee41cd07?item=1 (2022),

PLPCO, *Resource Management Plans by County*, Utah's Public Lands Policy Coordinating

Office, *available at:* https://rmp.utah.gov/county-resource-plans/ (2021). The CRMP and Utah

SRMP include locally adopted objectives and policies for federal land management and include

findings, provisions, and policies relating to natural resource development and environmental

quality relevant to the current planning process. In addition to the CRMP and Utah SRMP, Utah

Code Title 63J also establishes the State's position that BLM land-use plans should: "support

valid existing transportation . . . privileges on federal land at the highest reasonably sustainable levels, and keep open to motorized travel, any road in the subject lands that is part of the respective counties' duly adopted transportation plan."

BLM has failed to follow the provisions of FLPMA and the Dingell Act; its DR is inconsistent with the CRMP and Utah SRMP, and BLM completely failed to discuss these inconsistencies or make any attempt to resolve them.

NEPA requires that BLM allow cooperating agencies a meaningful opportunity to participate in the reconsideration process as required in 40 C.F.R. 1501.8. Specifically, NEPA requires cooperating agencies be allowed to participate in the NEPA process at the earliest practicable time. 40 C.F.R. 1501.8(b)(1). BLM is required to use the environmental analysis and proposals of cooperating agencies to the "maximum extent practicable" and "shall develop a schedule, setting milestones for all environmental reviews and authorizations required for implementation of the action, in consultation with… cooperating agencies as soon as practicable". 40 C.F.R. 1501.7 (h)-(i).

BLM held a meeting with the cooperating agencies less than 24 hours before the planned release of the reconsideration plan for public comment. The meeting was informational only. Maps were shown but not disseminated to cooperating agencies, and the BLM did not ask for the advice, opinion, or any meaningful input from those present. BLM representatives indicated that they could not provide additional time for the cooperating agencies to review and consult further on the reconsideration, prior to or even during the public comment period, due to the deadline imposed in the Settlement Agreement.

Plaintiffs' representatives made a verbal request at the meeting and a written request dated July 8, 2022, asking for additional time to provide meaningful input. These requests were

denied.

The BLM violated NEPA by failing to implement to the maximum extent practicable, or even to consider, the analysis and proposals of cooperating agencies. BLM disregarded the input of cooperating agencies and not only closed all routes proposed in the Preliminary Reconsideration but closed three additional roads, SD308, SD312, and SD333, that were not initially disclosed. The BLM further violated the law by failing to consider the requirement that access be provided to State-owned Trust Lands managed by SITLA under the *Cotter* decision, as well as access to a road congressionally designated as open under the Dingell Act.

## VI.    Violation of the Settlement Agreement with SUWA

The DR was the direct result of a Settlement Agreement reached in the case of *Southern Utah Wilderness Alliance v. U.S. Bureau of Land Management, et. al.*, Case No. 2:21-cv-0091-DAK-JCB in which SUWA challenged six RMPs developed by the BLM in 2008 (the RMP Settlement Agreement). Paragraph two of the RMP Settlement Agreement required that the BLM comply with applicable law, including OHV regulations at 43 C.F.R. Part 8340 and NEPA. Paragraph five of the Settlement Agreement requires that the BLM consult with interested user groups, federal, state, county and local agencies, local landowners, and other parties in a manner that provides an opportunity for the public to express itself and have its views given consideration, in accordance with 43 C.F.R. 8342.2(a).

The BLM violated the RMP Settlement Agreement and NEPA by failing to substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a). The OHV regulations are merely mentioned in passing in the DR, with no showing of compliance.

## VII. Violation of vested R.S. 2477 rights-of-way and the Fifth Amendment

The BLM's DR closes motorized access to 195 miles of roads subject to the Plaintiffs'

pre-1976 vested property rights, in violation of FLPMA Sec. 701(a). 43 U.S.C. 1701. Because acceptance and vesting of R.S. 2477 rights-of-way required no administrative formalities or formal act of public acceptance by the United States, the rights-of-way for the 195 miles of R.S. 2477 roads within the BLM's TMA vested upon the roads receiving at least ten years of continuous public use. *See SUWA v BLM*, 425 F.3d 735, 741 (10th Cir. 2005).

In its recent *Kane (2)* decision, this Court has ruled that, with regard to R.S. 2477 roads, the State and Counties have done all that was required by Congress, and unless the United States disputes title, it has an obligation to treat the State and Counties in the same manner as it did prior to October 21, 1976, for the roads at issue." *Kane Cnty v. U.S.*, 2:10-cv-01073-CW, Dkt. 792, at 29 (Memorandum Decision and Order Re: Motions to Dismiss and Definition of "Holder") (D. Utah Aug. 9, 2024).

The BLM's DR completely fails to take into consideration any R.S. 2477 assertions. In the *Kane (2)* decision, this Court considered the BLM's closure and control of R.S. 2477 roads in the Monument Management Plan for the Grand Staircase-Escalante National Monument. *Kane (2)* Decision, at 54. Like the BLM's DR here, the BLM's Monument Management Plan disregarded the State's vested rights under R.S. 2477. *Id*, at 55. In the Monument Management Plan, the BLM altered the status of the State and Kane County's existing rights by moving all roads under its jurisdiction and authority and by controlling whether a road will be opened or closed. *Id*, at 57. This Court, citing *Salazar*, found that "the BLM is not entitled 'to make unilateral changes in the status quo without first considering the legitimate interests of the other.'" *Id.*, citing *Kane Cnty., Utah v. Salazar,* 562 F.3d. 1077, 1091 (10th Cir. 2009) (Henry, J., concurring). Since the BLM had failed to consider the legitimate vested property interests of the State and Kane County, this Court found that the BLM Monument Management Plan unlawfully

regulated the valid, existing rights of the State and Kane County as holders of R.S. 2477 rights-of-way. *Id*. at 57.

In the present case, the BLM has similarly failed to consider the legitimate vested property interests of the State and County in the San Rafael Desert TMA and is seeking to unlawfully regulate the State's valid existing rights. In developing the TMP for the San Rafael Desert TMA, the BLM did not consider any R.S. 2477-related evidence. If the BLM wishes to treat the State as a non-holder of its vested property rights, it must first dispute the State's title. *Kane (2)* Decision, at 29. Since the BLM has at present failed to dispute the State's title to the roads with the San Rafael Desert TMA, it must treat the State as a title holder and provide motorized access to all R.S. 2477 roads within the TMA.

During the development of the Environmental Assessment for the San Rafael Desert TMP and the BLM's reconsideration process, the State, acting at times both as a Cooperating Agency and as a participant in the public comment periods, urged the BLM to consider its interests. Dkt. 35, First Am. Compl. at ¶¶ 12-17. Despite the requests, the BLM failed to consider the State's interests, including its vested rights under R.S. 2477. The State's input was ignored throughout the planning process.

In the *Kane (2)* decision, this Court recently held that the BLM's failure to treat any road as being an R.S. 2477 right-of-way absent judicial adjudication constitutes "an implicit dispute of the State and Kane County's title because such unilateral decision making is contrary to the rights of a holder." *Kane (2)* Decision, at 58. In this case, the BLM also failed to treat any road in the TMA as an R.S. 2477 road, despite the State's valid claims, while also refusing to dispute the State's title. The BLM is trying to have it both ways, failing to acknowledge the State's vested title claims while also refusing to dispute the title for jurisdictional reasons. This Court in the

*Kane (2)* decision described this technique as "a course of action to shut the courthouse doors to Plaintiffs [*i.e.*, the State and counties] seeking to perfect titles to roads that are key to Plaintiffs' transportation systems." *Id.* at 11. The BLM has failed to take a hard look at the significant consequence of its DR on the vested property rights of the State, despite clear requests by the State to do so, in order to satisfy the BLM's own jurisdictional purposes. This abrogates the very purpose of performing NEPA analysis for a BLM TMP and taking a hard look at the consequences of the agency action. The San Rafael Desert DR should be set aside until the BLM takes the necessary hard look at the consequences that the closure of R.S. 2477 roads will cause to the State's vested property rights.

In *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005), the Tenth Circuit Court of Appeals stated that because "FLPMA explicitly preserved and protected R.S. 2477 rights of way in existence as of October 21, 1976, and that those rights have the status of vested real property rights, any post-1976 changes in agency interpretation of the repealed statute have questionable applicability." *Id.* at 760. The court further noted that "it is hard to square . . . law-changing discretion with the concept of property rights that vested, if at all, on or before a date almost 30 years ago." *Id.*

In *Block v. North Dakota ex rel. Bd. Of University and School Lands*, 461 U.S. 273 (1983), the United States Supreme Court stated that the Quiet Title Act (QTA) "does not purport to effectuate a transfer of title." The Court also noted that even in situations where the QTA statute of limitations has run, the QTA "does not purport to strip any State, or anyone else for that matter, of any property rights." *Id.* at 291. The Court also opined that if Congress had done so by statute, it "would have constituted a taking of the State's property without just compensation, in violation of the Fifth Amendment." *Id.*

The DR's closure of 195 miles of roads that are subject to R.S. 2477 rights-of-way held by the State and Emery County, and that have the status of vested real property rights, constitutes a taking of property of the State and Emery County in violation of the Fifth Amendment to the United States Constitution. This Court in the *Kane (2)* decision stated that, "Until title is perfected under the Quiet Title Act, the United States retains that right to challenge a claim to vested title, but such challenge must be done through the QTA and not through an informal policy of the United States. It also must be done as a good faith dispute, rather than as a means to circumvent R.S. 2477 rights. See *Kane Cnty., Utah v. Salazar*, 562 F.3d 1077, 1090 (10th Cir. 2009) (Henry, J. concurring) (stating "[t]he federal agency is not entitled, under the FLPMA and the Administrative Procedures Act (APA), to close existing county roads asserted to be R.S. 2477 rights-of-way without a reasoned and nonarbitrary basis for doing so, such as . . .substantial evidence that the asserted right-of-way is invalid.")." *Kane (2)* Decision, *supra*, at 33.

## STANDARD OF REVIEW

The Plaintiffs' claims arise under the APA, 5 U.S.C. § 702. Under the APA, 5 U.S.C. § 706(2), a court must:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law; . . .
> (F) unwarranted by the facts to the extent that the facts are subject to trial do novo by the reviewing court.

An action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield the agency's action from a thorough, probing, in-depth review.'" *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)) (alteration marks omitted). To survive judicial review under the arbitrary and capricious standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). This review "focuses on the rationality of an agency's decision making process rather than the rationality of the actual decision." *Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).

## ARGUMENT

BLM violated the Utah Enabling Act, federal case law, the Dingell Act, FPLMA, NEPA and the Fifth Amendment to the Constitution of the United States by issuing its DR for the San Rafael Desert TMP. First, the BLM's DR deprives the State of Utah and SITLA of legally protected access to state-owned Trust Lands administered by SITLA, contrary to court precedent. Second, the BLM violated the Dingell Act. Third, BLM acted arbitrarily and capriciously in violation of the APA in deciding which roads to close and which roads to keep open. Fourth, the BLM violated FLPMA and the APA by failing to comply with the Multiple Use and Sustained Yield mandate. Fifth, the BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands. Sixth, the BLM violated FLPMA and its implementing regulations by failing to comply with requirements for public comment and coordination with State and local governments and

failing to provide a TMP consistent with Utah Resource Management Plans. Seventh, the BLM violated the RMP Settlement Agreement and NEPA by failing to comply with and substantiate its compliance with the requirements of 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a). Eighth, the BLM violated FLPMA, NEPA and the Fifth Amendment to the Constitution of the United States by failing to consider rights-of-way for which the State and County hold vested title interests, by closing public motorized access to roads subject to those rights-of-way, and thereby unlawfully taking property of the State and County.

> **I.     BLM's Elimination And Restriction Of Access To SITLA Parcels Violate Utah's Right To Access Trust Lands Under The Utah Enabling Act And Federal Case Law.**

In 1894, Congress passed the Utah Enabling Act which admitted Utah into the Union as a state. Case law from the Tenth Circuit and Utah Federal District Courts has called the Utah Enabling Act a "solemn bilateral agreement," and a "contract, with bargained-for consideration exchanged between two governments." *Utah v. Kleppe*, 586 F.2d 756, 758 (10th Cir. 1978); *State of Utah v. Andrus*, 486 F. Supp. 995, 1001 (D. Utah 1979). "In return for receiving the federal lands Utah disclaimed all interest in the remainder of the public domain, agreed to forever hold federal lands immune from taxation, and agreed to hold the granted lands, or the proceeds therefrom, in trust as a common school fund." *State of Utah v. Andrus*, 486 F. Supp. 995, 1001 (D. Utah 1979). Accordingly, "Utah [has] a right of access to state school trust lands." *Id*. at 1011.

In *Andrus*, the Court held that although Utah's access rights to state school trust lands are subject to federal regulation, such regulations cannot prohibit access or be so restrictive as to make economic development "competitively unprofitable," as such an outcome could "constitute a taking." *Id*. at 1011. This applies even when BLM issues regulations to prevent impairment of

wilderness characteristics. *Id.* This prescient ruling foreshadowed the Supreme Court's later holding in *Lucas v. South Carolina Coastal* that regulations which "deprive[] land of all economically beneficial use" constitute a *per se* taking. *Lucas*, 505 U.S. 1003, 1027 (1992).

Pursuant to the Utah Constitution, the State of Utah owns all property interests acquired from the United States at or after the time of statehood. UTAH CONST. Art. XX. The State of Utah holds fee title to over 70 sections of Trust Lands within the San Rafael Desert TMA that are administered and managed by SITLA. Many of the roads within the TMA provide transportation and access to these Trust Lands and contribute to the financial viability of the public-school systems in the state.

The DR closes and eliminates motorized access to six sections of Trust Lands owned by the State of Utah and managed by SITLA. Those SITLA sections are: (1) Township 25 South, Range15 East, Section 36; (2) Township 25 South, Range 15 East, Section 32; (3) Township 24 South, Range 16 East, Section 16; (4) Township 23 South Range 15 East, Section 32; (5) Township 24 South, Range 14 E, Section 2; and (6) Township 26 South Range 15 East, Section 32. AR at 6120-6127. Access to these parcels is eliminated by the DR's closure of twelve routes: (1) SD371_Seg 2, (2) SD525, (3) SD536, (4) SD720, (5) SD870, (6) SD869, (7) SD956, (8) SD952, (9) SD948a, (10) SD128, (11) SD319, and (12) SD320. *Id*.

These closures render the economic development of the affected sections of land competitively unprofitable both to the State as well as its lessees. Such restrictions violate Utah's right to access its trust lands and constitute a taking under both *Andrus* and *Lucas*. Additionally, granting the State administrative access to the now-closed roads would not provide the access rights owed under the Utah Enabling Act. These roads are primarily maintained through public use. Administrative use alone is insufficient to keep the roads in useable condition.

The marketability and value of the affected Trust Lands will be significantly reduced, diminishing their per-acre value. The closure of access roads severely limits the potential uses of these Trust Lands, thereby reducing their attractiveness to potential buyers or lessees. Continued access to these Trust Lands is paramount for fulfilling the intent of the original land grant from the United States.

In addition to the valuation loss, SITLA has very limited budgets for road maintenance. This is by design, to maximize disbursements of revenue. Therefore, it is imperative for the State, SITLA, and their Trust Lands beneficiaries that roads leading to SITLA Trust Lands be open to the public; this allows SITLA to partner with the Emery County Road Department and others to improve or maintain the roads when needed.

**II.     The BLM acted in violation of the Dingell Act by closing route number SD598, which was designated as an open "State Route" under the Act, and by failing to consider and facilitate the expansion of hunting, fishing, and recreational shooting.**

On March 12, 2019, the United States Congress passed Public Law 116-9, otherwise known as the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"). John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pl 116-9, March 12, 2019, 133 Stat 580. The Dingell Act designated 18 wilderness areas in Emery County, including the Labyrinth Canyon Wilderness located within the San Rafael Desert Travel Management Area. *Id*. at Section 1231, 133 Stat. 71. As part of the process, an Overview Map dated February 5, 2019, was created, and memorializes route number SD598 as an open "State Route." *Id*. at 133 Stat. 667.

The BLM's DR closed this congressionally designated open route. The closure, regardless of the condition or use of the road, is contrary to expressed congressional intent, an

illegal overreach, a violation of federal law, and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706. BLM cannot administratively override congressional action.

The Dingell Act also states:

> SEC. 4001.  CONGRESSIONAL DECLARATION OF NATIONAL POLICY.
>
>   (a) In General.--Congress declares that it is the policy of the United States that Federal departments and agencies, in accordance with the missions of the departments and agencies, Executive Orders 12962 and 13443 (60 Fed. Reg. 30769 (June 7, 1995); 72 Fed. Reg. 46537 (August 16, 2007)), and applicable law, shall--
>   (1) facilitate the expansion and enhancement of hunting, fishing, and recreational shooting opportunities on Federal land, in consultation with the Wildlife and Hunting Heritage Conservation Council, the Sport Fishing and Boating Partnership Council, State and Tribal fish and wildlife agencies, and the public;
>   (2) conserve and enhance aquatic systems and the management of game species and the habitat of those species on Federal land, including through hunting and fishing, in a manner that respects--
>       (A) State management authority over wildlife resources; and
>       (B) private property rights; and
>   (3) consider hunting, fishing, and recreational shooting opportunities as part of all Federal plans for land, resource, and travel management.

*Id.*, 133 Stat. 757.  This language in the Dingell Act mandates that federal departments and agencies consider and facilitate the expansion of hunting, fishing, and recreational shooting opportunities as part of all federal plans for land, resource and travel management. Dingell Act, at Section 4001, 133 Stat. 756. BLM failed to comply with this mandate; there is no indication anywhere in the Administrative Record that it did so. There can be no question that closing 195 miles of roads in the San Rafael Desert fails to enhance or facilitate hunting, fishing, and recreational shooting.

**III.    The BLM acted arbitrarily and capriciously in violation of the APA in deciding which roads to close and which roads to keep open, and by closing 195 miles of roads.**

The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

A thorough analysis of the specific facts underlying BLM's DR reveals that the BLM acted arbitrarily and capriciously in deciding which roads to close and which roads to keep open.

The Road identified by the BLM as SD520 was left open during BLM's reconsideration process but is in the same condition or even less traveled and defined than many of the routes considered "reclaimed or reclaiming" under the DR. Dkt. 35, First Am. Compl. Ex. 2.  The road is substantially similar to SD788, SD536, and SD516, which were initially open under the original TMP. These routes, like others, are listed as being appropriate for closure to minimize damage to resources documented in the area. They are in an area that is prominently black brush and blow sand, just like SD520; they are all typically one windy or rainy season away from having the track marks that reveal route usage reclaimed.

Nowhere does BLM reference any specific species or other resources that would be impacted if they were left open; there is nothing to significantly distinguish these routes from SD520, demonstrating the arbitrary and capricious nature of the decision-making process.

The road identified as SD685b was left open under the original 2020 TMP but is now

designated as closed. The stated reason for closure of SD685b in the DR is to protect habitat for managed and special status species, wilderness character, and native pollinators; however, as shown in Exhibit 3 to the Amended Complaint, the route goes through a grove of invasive tamarisks that should be managed under various federal laws rather than protected through route closures. Invasive species are not beneficial for managed or special status in this area nor are they typically targets for native pollinators. *Id*., Ex. 3.

The road designated as SD1027, Segment 2, provides access to a scenic and unique area that overlooks the Green River. As shown in Exhibits 4a and 4b to the Amended Complaint, attached hereto, the road is far from reclaimed; it is actually in very good condition and provides access to remarkable views for a wide range of recreationalists, including basic four-wheel drive vehicles. *Id*., Ex. 4a and 4b. The rationale for closing road SD1027 is nearly identical to the rationale used for closing road SD1050. The difference is that road SD1050 does not actually exist on the ground, has been fully reclaimed, and not even a remnant or segment is visible. The fact that these two roads (SD1027 and SD 1050) are being closed under an identical rationale further demonstrates the arbitrary and capricious nature of BLM's decision-making process.

The road identified as SD1340, Segment 1 is being closed primarily because it is a redundant route; however, the important difference between this and other roads is that it provides a vastly different recreational experience to the roads it parallels. The road is visible and easily identifiable on the ground. *Id*., Ex. 5. It provides a more rugged all terrain experience, whereas the parallel routes provide a much easier and novice-friendly experience.

Based on the inadequate record, the BLM's DR failed to adhere to the BLM's own rules and regulations. BLM improperly reversed its previous NEPA process. The same NEPA process that supported keeping routes open, without any articulated changes to the record, now

apparently supports the full closure of 195 miles of previously open routes.

Absent justification within the Administrative Record, the decision process that led to the closure of the 195 miles of routes in the TMP that were previously designated as open is arbitrary and capricious, as well as illegal and *ultra vires*.

## IV.    BLM'S DR Violates The "Multiple Use And Sustained Yield" Mandate Of FLPMA

The guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a). "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id*. at § 1702(c). These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*. "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. at § 1702(h). The Tenth Circuit has said:

"To fulfill its multiple use mission, BLM must design its land use plans to strike a balance among the many competing uses to which land can be put." *Western Watersheds Project v. BLM*, 721 F.3d 1264, 1268 (10th Cir. 2013).

Contrary to the multiple use and sustained yield mandate, the BLM's DR considered conservation exclusively, failing entirely to take into account other uses. The Amended Complaint in this action, Dkt. 35, articulates the interests that the Plaintiffs have in a number of multiple uses, including: (1) Transportation System Management and R.S. 2477 (¶¶ 47-49); (2) Motorized Recreation and Access (¶¶ 50-55); (3) Livestock Grazing and Agriculture (¶¶ 56-72);

and (4) Wildlife Management and Control (¶¶ 73-75).

Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Transportation connectivity reduces in and out traffic and can help disperse use. Additionally, keeping roads open provides the traveling public access while reducing the need and desire to pioneer new and unauthorized routes.

The BLM's DR violates FLPMA by failing to manage the public lands of the San Rafael Desert TMA in accordance with principles of multiple use and sustained yield and is arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706.

**V.    The BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands.**

Constitutional authority to classify and manage public lands resides with Congress. United States Constitution, Article IV, Section 3 cl. 2. In various federal laws, including but not limited to the Taylor Grazing Act ("TGA"), 43 U.S.C. §§315-315q, FLPMA, 43 U.S.C. §§1701 *et seq.*, the 1872 Mining Law, as amended, 30 U.S.C. §§20, *et seq.*, and the Mineral Leasing Laws ("MLA"), 30 U.S.C. §§181, *et seq.*, Congress has delegated its constitutional authority to Federal Defendants to manage public lands. This delegated authority is defined and limited by the terms of the respective federal statutes.

Even though the DR does not use the term "wilderness" to describe its management of the San Rafael Desert TMA, the practical effect of the BLM's decision to close 195 miles of roads in the DR was to create WSA-type management. BLM's wilderness review authority under § 603 of FLPMA, 43 U.S.C. §1782(c), has terminated, and as a result, BLM must "not manage or

otherwise treat public lands, other than §603 WSAs. . . as WSAs or as wilderness pursuant to the [FLPMA] §202 process." As a result, the BLM's DR unlawfully treats the non-WSA lands of the San Rafael Desert TMA as *de facto* WSA lands.

**VI.    The BLM violated FLPMA and its implementing regulations by failing to produce a TMP consistent with Utah Land Management Plans and failing to comply with requirements for public comment and coordination with state and local governments**

Under FLPMA and NEPA, the DOI and BLM must "allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands." 43 U.S.C. §1712(c)(9). DOI and BLM must also coordinate with and provide for meaningful involvement of state and local governments "in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands." *Id*.

BLM regulations implementing FLPMA are in accord. "The public shall be provided opportunities to meaningfully participate in and comment on the preparation of plans, amendments and related guidance and be given early notice of planning activities." 43 C.F.R. §1610.2.

BLM did not comply with regulations requiring them to provide meaningful notice and comment periods.  Nor did they coordinate with State and local governments before announcing and implementing the DR challenged by this action.

Additionally, the BLM's TMP and DR are not consistent with the State's duly adopted

Resource Management Plan. FLPMA requires that BLM land use plans be "consistent with State and local plans to the maximum extent [the Secretary of Interior] finds consistent with Federal law and the purposes of [FLPMA]." 43 U.S.C. § 1712(c)(9). Regulations implementing FLPMA require the BLM to provide state governors with the opportunity to submit a "Governor's Consistency Review" of a BLM land use plan, and further require the BLM to consider and analyze the Governor's recommendations. 43 C.F.R. § 1610.3-2(e).

The BLM denies that travel management plans are "land use plans" under FLPMA, and claim that the FLPMA requirements of 43 U.S.C. § 1712(c)(9) or the regulatory requirements of 43 C.F.R. § 1610.3-2(e) do not apply to travel management plans. The BLM has not justified its reasoning that travel management plans are merely "implementation level decisions" that do not fall under the auspices of FLPMA land use plans.

The BLM has violated FLPMA and its implementing regulations by not seeking consistency between its DR and the State and local Resource Management Plans, and by failing to provide the Governor of Utah with the formal opportunity to submit a Governor's Consistency Review of the DR.

## VII.    The BLM violated the Settlement Agreement and NEPA by failing to comply with and substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a).

The DR was the direct result of a Settlement Agreement reached in the case of *Southern Utah Wilderness Alliance v. U.S. Department of Land Management, et. al.*, Case No. 2:21-cv-0091-DAK-JCB. Paragraph two of the Settlement Agreement required that the BLM comply with applicable law, including OHV regulations at 43 C.F.R. Part 8340 and NEPA. AR at 6103. Paragraph five of the Settlement Agreement requires that the BLM consult with interested user

groups, federal, state, county and local agencies, local landowners, and other parties in a manner that provides an opportunity for the public to express itself and have its views given consideration, in accordance with 43 C.F.R. 8342.2(a). AR at 6104.

The BLM violated the Settlement Agreement and NEPA by failing to substantiate its compliance with the requirements 43 C.F.R. Part 8340 and 43 C.F.R. 8342.2(a). The OHV regulations are merely mentioned in passing in the DR, with no showing of compliance.

BLM held a meeting with the State, SITLA, and Emery County, all Cooperating Agencies, on July 7, 2022, to unveil its Preliminary Reconsideration Decision. Dkt. 35, First Am. Compl. at ¶ 12. At that meeting, maps were shown but not disseminated, and it was apparent that BLM was not interested in hearing concerns or comments from the State, SITLA, or Emery County prior to the public comment period on the Preliminary Reconsideration Decision. *Id*. at ¶ 12. BLM planned to publish the Preliminary Reconsideration Decision and open public comment the next day; however, due to technical difficulties, publication did not occur until July 12, 2022. *Id*. at ¶ 13. The State of Utah and Emery County submitted their comment letters on August 26, 2022. On October 28, 2022, BLM published its DR that not only fully incorporated the entirety of the Preliminary Reconsideration Decision but closed an additional three roads (SD308, SD312, and SD333) that the State, Emery County, and SITLA were told would be left open. *Id*. at ¶ 15.

SITLA also submitted relevant comments during each of the respective comment periods. *Id*. at ¶ 16. Although all Plaintiffs provided detailed comments, BLM did not make a single change to its Preliminary Reconsideration Decision. *Id*. at ¶ 17.

**VIII.   The BLM violated FLPMA, NEPA and the Fifth Amendment to the Constitution of the United States by unlawfully closing roads to which the State of Utah and Emery County hold vested R.S. 2477 rights-of-way, and by failing to even consider such rights-of-way.**

Congress passed R.S. 2477 in 1866, granting a general "right-of-way for the construction of highways" over unreserved federal public lands. Furthermore, the Tenth Circuit has held that "title to [R.S. 2477] rights of way pass[] independently of any action or approval on the part of the BLM." *SUWA v. BLM*, 425 F.3d 735, 754 (10th Cir. 2005). The BLM's own manual once contained a provision which read, "When the history of a road is unknown or questionable, its existence in a condition suitable for public use is evidence that construction sufficient to cause a grant under RS 2477 has taken place." *Sierra Club v. Hodel*, 675 F. Supp. 594, 605 (D. Utah 1987) (quoting BLM Manual, Rel. 2-229, June 30, 1986).

Congress repealed R.S. 2477 in 1976 with the passage of FLPMA. However, Congress explicitly preserved R.S. 2477 roads, stating "[n]othing in this Act, or in any amendment made by this Act, shall be construed as terminating any valid . . . right-of-way, or other land use right or authorization existing on the date of approval of this Act." Fed. Land Pol'y & Mgmt. Act of 1976, Pub. L. No. 94–579, §§ 501. § 701(a).

At issue in the current case are rights-of-way granted under R.S. 2477 which Utah obtained through the construction and maintenance of these roads prior to the passage of FLPMA. To this point, BLM has asserted that its closures of R.S. 2477 roads do not constitute a dispute of Utah's vested R.S. 2477 rights. In doing so, BLM has treated Utah as a non-holder of vested R.S. 2477 rights and required that, to establish itself as a holder, Utah must bring action under the Quiet Title Act.

However, this practice has recently been condemned by this Court in the case of *Kane County v. U.S.,* 2:10-cv-01073-CW, Dkt. 792 (D. Ut. Aug. 9, 2024) (Hereafter, "The Decision"). The Decision was issued as part of an ongoing suit between Kane County and the United States government regarding the closure of R.S. 2477 roads in the Grand Staircase-Escalante National Monument. Under its management authority over the Monument, the BLM developed a Monument Plan which set forth a "transportation system" which closed and otherwise attempted to manage roads within the Monument, many of which were subject to vested R.S. 2477 rights.

For example, in the case of the Hole-in-the-Rock Road, BLM refused to allow Kane County to improve the road, despite acknowledging the need for improvements, because it refused to recognize or treat Kane County as a valid R.S. 2477 holder until those rights had been adjudicated. Kane County sued, and the BLM attempted to have the suit dismissed for a lack of title dispute, claiming that it neither admitted nor denied Kane County's title.

The *Kane* Court rejected the BLM's motion for dismissal and held that "imposing a mandate of adjudicated title is contrary to law and the United States' authority." *Id*. at 60. The Court reasoned that R.S. 2477 "imposed no burden on [Utah] to prove to the United States [its] status as [a] holder before the State . . . could exercise [its] rights. Those who were holders on October 20, 1976, continued to be holders when Congress passed FLPMA the following day. . .. Congress also imposed no requirements on the State or counties to prove up their status before a court if they wanted to continue to be treated as holders." *Id.* at 27.

Additionally, in response to the BLM's assertion that its road closures did not constitute a title dispute, the Court held that, until a title dispute arises, "the United States has an obligation to continue allowing the State and counties to exercise their vested property rights without

interference." *Id.* at 32. Such vested rights include the rights to maintenance and management of R.S. 2477 roads. *Id.* at 34-35.

This case likewise deals with the violation of vested R.S. 2477 rights. The fact that the road closures are the result of a Travel Management Plan rather than a Monument Plan is immaterial. In both cases, BLM has disregarded vested R.S. 2477 rights using the self-contradictory rationale that it can at once deny Utah its management and maintenance rights under R.S. 2477 while refusing to officially dispute those very rights. In both cases, BLM has asserted that the State carries the burden of proving its R.S. 2477 rights through adjudication. However, the Decision clearly rejects BLM's rationale and holds R.S. 2477 rights are self-executing, vested, and valid until such time as the United States chooses to challenge those rights under the Quiet Title Act. As such, "unless the United States disputes [Utah's] title, it has an obligation to treat the State . . . in the same manner as it did prior to [the passage of FLPMA], for the roads at issue." *Id.* at 29.

The State and the County are joint owners of R.S. 2477 rights-of-way within Emery County, Utah. Utah Code Ann. §§ 72-5-302(2) (Supp. 2011) and -103(2)(b) (2004); id. §§ 72-3-103(3) (2004) and -105(3). The 195 miles of roads and road segments that were closed by the BLM's DR are subject to R.S. 2477 rights-of-way jointly owned by the State of Utah and Emery County.

The BLM's DR closes a 1.3-mile segment of the Moonshine/Saucer Basin Wells Road, designated by the BLM as Route SD 219, Seg. 2. This road is also designated as Emery County D Road 4060 and is included in a quiet title action based upon R.S. 2477 currently pending before this Court. *See Emery County and the State of Utah v. United States of America,* Case No. 2:12-cv-00429-CW (D. Utah 2012), Amended Complaint Dkt. 6, ¶¶ 3528-3540.

For the reasons articulated above, BLM's road closures and its associated DR violate Utah's vested R.S. 2477 rights. Said rights are self-executing and fully vested, according to the terms of both R.S. 2477 and FLPMA, and any requirement to establish those rights via adjudication is unlawful. The burden falls on the BLM to dispute those rights. Until that time, Utah's rights to manage and maintain these roads may not be infringed.

NEPA requires federal agencies such as the BLM to take "hard look" at the environmental consequences of a federal action warranting NEPA analysis. During the development of the EA for the BLM's TMP, the State and County asked the BLM to consider the impacts of road closures on their vested rights under R.S. 2477. Despite these requests, the BLM declined to even consider these impacts. The BLM's failure to consider how its road closures would impact the vested rights of the State and County violates NEPA's "hard look" standard.

The closure of 195 miles of roads that are subject to R.S. 2477 rights-of-way held by the State and Emery County, and that have the status of vested real property rights, also constitutes a taking of property in violation of the Fifth Amendment to the United States Constitution.

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, the Court should declare that BLM violated the APA, federal case law, FLPMA, NEPA and the Fifth Amendment. At a minimum, the Court should vacate the agency's decision as arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706.

Respectfully submitted this 17th day of January 2025.


<u>/s/*Roger R. Fairbanks*</u>
Roger R. Fairbanks
Kathy A.F. Davis
K. Tess Davis

Attorneys for Plaintiffs
State of Utah *et al*.

## CERTIFICATE OF SERVICE

I certify that on this 17th day of January 2025, the undersigned electronically filed the foregoing OPENING BRIEF OF PLAINTIFFS with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all counsel of record.

/s/ *Roger R. Fairbanks*
Roger R. Fairbanks
Assistant Attorney General